948 A.2d 11

**Dianne ANDERSON, et al.**

v.

**COUNCIL OF UNIT OWNERS OF the GABLES ON TUCKERMAN CONDOMINIUM, et al.**

**No. 99, Sept. Term, 2007.**

Court of Appeals of Maryland.

April 15, 2008.

Reconsideration Denied June 10, 2008.

Matthew S. Tidball (McCarthy Wilson, LLP, Rockville), on brief, for appellants.

Thomas C. Mugavero (Whiteford, Taylor & Preston, LLP, Washington, DC), on brief, for appellees.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, MURPHY and DALE R. CATHELL (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

In the present case, we are presented with the question of whether a condominium council of owners under the Maryland Condominium Act, Section 11–101, *et seq.*, of the Real Property Article, Maryland Code (1974, 2003 Repl.Vol.) ("the Act"), is required to repair or replace property of an owner in an individual condominium unit after a casualty loss. We shall answer in the negative.

## I. Introduction

This appeal consists of two separate underlying cases that were consolidated by the Court of Special Appeals, which we have followed. Although the facts of the underlying cases are different, they present the same legal issue.

*Dianne Anderson, Individually, et al. v. Council of Unit Owners of The Gables on Tuckerman Condominium,* No. 271904, Circuit Court for Montgomery County

The Gables on Tuckerman Condominium, located at 5800 Tuckerman Lane in Rockville, Maryland, was established by declaration, bylaws and plats recorded among the land records of Montgomery County in August of 1987. The Council of Owners of The Gables on Tuckerman ("Council of Gables") is

the unincorporated association of all owners that was established by its Bylaws.[1]

1. Article 8 of The Gables on Tuckerman Condominium's Bylaws states in part:

Section 3. *Duty to Maintain.* Except for maintenance requirements imposed upon the Council by the Declaration or these Bylaws, if any, the Unit Owner of each Unit shall, at his own expense, maintain the interior of his Unit and any and all equipment, appliances or fixtures situated within the Unit and its other appurtenances in good order, condition and repair and in a clean and sanitary condition, and shall do all redecorating, painting and the like which may at any time be necessary to maintain the good appearance of his Unit and such appurtenances. In addition to the foregoing, the Unit Owner of any Unit shall, at his own expense, maintain, repair and replace any plumbing fixtures, heating and air conditioning equipment, heat pumps and compressors, lighting fixtures, refrigerators, dishwashers, clothes washers and dryers, disposals, ranges, fireplace flues, and/or other equipment that may be in or appurtenant to his Unit. The Unit Owner shall also be responsible for routine maintenance, at his own expense, of the Limited Common Elements which he has a right to use an d shall keep such limited common elements in good, clean and sanitary condition at all times.

\*　　\*　　\*

Section 5. *Limitation of Liability.* The Council shall not be liable for any failure of water supply or other utilities or services to be obtained by the Council or paid for out of the Common Expenses, or for injury or damage to persons or property caused by the elements or by any Unit Owner or any other person, or resulting from electricity, water, snow, or ice which may leak or flow from any portion of the Common Elements or from any pipe, drain, conduit, appliance or equipment.

Section 1 of Article 13 of the Bylaws, entitled "Insurance," provides in part:

(a) To the extent such coverage is not provided by or through the Penbrooke Community Association, Inc., the Board of Directors, acting on behalf of the Council shall obtain and maintain, to the extent reasonably available, the following insurance, as a Condominium Master Insurance Policy the cost of which shall be an item of Common Expense:

(1) Property insurance on the Common Elements and Units, exclusive of improvement and betterments installed in Units by Unit Owners, insuring against all risks of direct physical loss commonly insured against including fire and extended coverage perils.

\*　　\*　　\*

(e) Any insurance policy issued to the Council or the Penbrooke Community Association, Inc. or any other association created pursu-

Dianne Anderson owned a two-level town home in The Gables.[2] At all times relevant, the Council of Gables carried a master condominium insurance policy on the property with a deductible of $10,000 per occurrence; Ms. Anderson was insured by a condominium owners "Condocover" policy issued by Erie Insurance Exchange ("Erie").[3]

In July of 2004, the water heater on the upper level of Ms. Anderson's home began leaking and water flowed through the ceiling into the kitchen, "causing severe water damage to the carpet and walls of the unit," amounting to $6,358.23. No other condominium town home was affected, nor was any other part of the structure damaged. Ms. Anderson requested that the Council of Gables repair or provide proceeds to repair the damage. The Council of Gables declined, and subsequently, after Ms. Anderson paid the $250.00 deductible, Erie paid for the repairs.

---

ant to Paragraph 11A.1. of the Declaration does not prevent a Unit Owner from obtaining insurance for his own benefit.

＊　　＊　　＊

(g) It is recommended by the Board of Directors that each Unit Owner obtain his own insurance policy on his Unit in the HO –6 form with an "improvements and betterments," "alterations and additions" or similar endorsements. NOTICE IS HEREBY GIVEN BY THE DEVELOPER THAT THE CONDOMINIUM MASTER POLICY REFERRED TO IN SECTION 1 OF THIS ARTICLE DOES NOT INSURE ANY ADDITIONS, ALTERATIONS, IMPROVEMENTS, BETTERMENTS OR MODIFICATIONS TO ANY UNIT AS SOLD BY THE DEVELOPER.

The Declaration of covenants and restrictions for The Gables on Tuckerman Condominium, Section 16(A), states:

Maintenance, repair and replacement of the Unit shall be performed by the Unit Owner and such maintenance, repair and replacement shall not be an item of Common Expense subject to the lien for assessments created herein.

2. At oral argument, both counsels characterized the properties at issue in this case as town homes.

3. The record does not include the Council of Gables' master policy and does not reflect the insurance company that issued the master policy, nor the extent of coverage thereunder. The record does reflect, however, that the amount of the master insurance policy's deductible was not chosen by the Council of Gables, but was dictated by the insurance industry based upon cost.

Dianne Anderson, individually, and Erie filed a two count complaint in the Circuit Court for Montgomery County, seeking to recover $6,358.23, the amount expended to repair her home. In Count I, they alleged that the Council of Gables breached its duty under Section 11–114 of the Maryland Condominium Act[4] to purchase property insurance on all common elements and units, and in case there was a deductible, apportion that deductible as a common expense, when the Council of Gables refused Ms. Anderson's request to pay for the remediation, repair or replacement of the damaged portion of her home. Count II alleged that the Council of Gables breached its fiduciary duty by refusing to repair the damage. Ms. Anderson and Erie later amended their complaint by adding that the Council of Gables "negligently" breached its duty under the Condominium Act in Count I and also filed a Motion for Partial Summary Judgment, to which the Council of Gables responded. The Circuit Court treated the Council of Gables' response as a Cross–Motion for Summary Judgment. The court conducted a hearing on January 22, 2007, and thereafter, Judge William J. Rowan, III granted the Council of Gables' motion, denied Ms. Anderson's and Erie's motion, and entered judgment in favor of the Council of Gables. Ms. Anderson and Erie appealed to the Court of Special Appeals on January 26, 2007.

---

**4.** The relevant portion of Section 11–114 of the Real Property Article, Maryland Code (1974, 2003 Repl.Vol.), relative to the alleged breach, provides:

(a) *Duty of council of unit owners to maintain property and liability insurance.*—Commencing not later than the time of the first conveyance of a unit to a person other than the developer, the council of unit owners shall maintain, to the extent reasonably available:

(1) Property insurance on the common elements and units, exclusive of improvements and betterments installed in units by unit owners. . . .

\* \* \*

(g) *Repair or reconstruction.*—(1) Any portion of the condominium damaged or destroyed shall be repaired or replaced promptly by the council of unit owners. . . .

The remainder of the Section is discussed in greater detail later.

*Erie Insurance Exchange, et al. v. The Council of Unit Owners of Bridgeport Condominium,* No. 03724, Circuit Court for Prince George's County

The Bridgeport Condominium, located at 809 9 Cherry Lane in Laurel, Maryland, was established by declaration, bylaws and plats recorded among the land records of Price George's County in January of 1988. The Council of Owners of Bridgeport Condominium ("Council of Bridgeport")[5] is the unincorporated association of all owners that was established by the Bylaws that govern The Bridgeport Condominium.[6]

─────────

5. The two condominium councils involved in this appeal hereinafter will be referred to collectively as "the Councils."

6. Article 14 of The Bridgeport Condominium's Bylaws provides in part:
 *Section 1. Management and Common Expenses.* The Council of Unit Owners, acting by and through its Board of Directors, shall manage, operate and maintain the Condominium and, for the common benefit of the Unit Owners, shall enforce the provisions hereof and shall pay out of the common expense fund the cost of managing, operating and maintaining the Condominium, including, without limitation, the following:

 \* \* \*

 (e) the cost of repairs, maintenance, service and replacement of the common elements of the Condominium, including, without limitation, the cost of painting, maintaining, replacing, repairing and landscaping the common elements and such furnishings and equipment for the common elements as the Board of Directors shall determine are necessary and proper; provided, however, that nothing herein contained shall require the Council of Unit Owners to repair, replace, or otherwise maintain the interior of any Condominium Unit or any fixtures, appliances, equipment or the like located therein. . . .
 Article 11 of the Bylaws states in part:
 *Section 1. Insurance.* The Council of Unit Owners shall obtain and maintain all insurance required by law, including, to the extent reasonably available, at least the following:
 (a) casualty or physical damage insurance in an amount equal to the full replacement value . . . of the Condominium. . . .

 \* \* \*

 *Section 5. Individual Policies—Recommendation of Declarant—Notice to Board of Directors.* The owner of any Condominium Unit . . . may obtain additional insurance (including a "Condominium Unit-Owner's Endorsement" or its equivalent, for improvements and betterments to the Condominium Unit made or acquired at the expense of the owner) at his own expense. Such insurance shall be written by the same carrier as that purchased by the Board of Directors pursu-

Charles and Cindy O'Carroll ("the O'Carrolls") owned a home in The Bridgeport Condominium, which they rented to Velma Kiawu.[7] The O'Carrolls also were insured by a condominium owners "Condocover" policy issued by Erie; the

ant to this Article or shall provide that it shall be without contribution as against same. Such insurance shall contain the same waiver of subrogation provision as that set forth in Section 3(g) of this Article. The Declarant recommends that each owner of any Condominium Unit obtain a plateglass damage policy and a "Tenant's Homeowner's Policy" or its equivalent, to insure against loss or damage to personal property used or incidental to the occupancy of the Condominium Unit, additional living expense, vandalism or malicious mischief, theft, personal liability and the like. Such policy should include a "Condominium Unit–Owner's Endorsement" or its equivalent, to cover losses to improvements and betterments to the Condominium Unit made or acquired at the expense of the Unit Owner.

Section 4 of Article 14 of The Bridgeport Condominium's Bylaws provides in part:

*Limitation of Liability.* The Council of Unit Owners shall not be liable for any failure of water supply or other services to be obtained by the Council of Unit Owners or paid for out of the common expense funds, or for injury or damage to person or property caused by the elements or resulting from electricity, water, snow or ice which may leak or flow from any portion of the common elements or from any wire, pipe, drain, conduit, appliance or equipment.

The Declaration of covenants and restrictions for Bridgeport Condominium, Section 1 of Article 8, states:

*Duty to Maintain.* The Council of Unit Owners shall maintain the general common elements. Except for maintenance requirements imposed upon the Council of Unit Owners, the owner of any Condominium Unit shall, at his own expense, maintain the interior of his Condominium Unit and any and all equipment, appliances or fixtures therein, and its other appurtenances ... in good order, condition and repair, free and clear of ice and snow, and in a clean and sanitary condition. Further, each Unit Owner shall do all redecorating, painting and the like which may at any time be necessary to maintain the good appearance of his Condominium Unit. In addition each Unit Owner shall, at his own expense, maintain, repair or replace any plumbing and electrical fixtures, water heaters, fireplaces, heating and air-conditioning equipment, lighting fixtures, refrigerators, freezers, trash compactors, dishwashers, clothes washers, clothes dryers, disposals, ranges, range hoods, and other equipment that may be in or declared to be appurtenant to such Condominium Unit. The Unit Owner shall also, at his own expense, keep any other limited common elements which may be appurtenant to such Condominium Unit and reserved for his exclusive use in a clean, orderly and sanitary condition.

7. Ms. Kiawu is not a party to the current appeal.

Council of Bridgeport carried a master insurance policy with a deductible of $25,000 per occurrence.[8]

On an evening in March of 2003, a grease fire erupted, which caused the ceiling sprinkler system to engage. Smoke, fire and water damage resulted; carpet, walls, blinds, cabinetry and a microwave in the O'Carrolls' home were damaged in the total amount of $12,157.14; the damage was confined to the O'Carrolls' home and the structure of the condominium was not affected. The O'Carrolls asked the Council of Bridgeport to repair or replace the damage, which the Council of Bridgeport declined to do; subsequently, after the O'Carrolls paid their $250.00 insurance policy deductible, Erie paid for the repair or replacement.

Erie, to its own use and to the use of the O'Carrolls, filed a three count complaint in the Circuit Court for Prince George's Court, seeking to recover $12,257.14,[9] the funds expended to repair the condominium. Counts I and II contained the same allegations as that filed in the Anderson case, while Count III alleged negligence against Ms. Kiawu. Erie and the O'Carrolls subsequently amended their complaint by adding an allegation that the Council of Bridgeport "negligently" breached its duty under the Act in Count I,[10] and also filed a Motion for Partial Summary Judgment. The Council of Bridgeport filed a motion in opposition, which was treated by the Circuit Court as a Cross–Motion for Summary Judgment. The court conducted a hearing on March 30, 2007, and thereafter, Judge Sherrie L. Krauser o f the Circuit Court for Prince George's

---

8. The record does not include the Council of Bridgeport's master policy and does not reflect the insurance company that issued the master policy, nor the extent of coverage thereunder. The record does reflect, however, that the amount of the master insurance policy deductible was not chosen by the Council of Bridgeport, but was dictated by the insurance industry as the best option for the price.

9. We note the discrepancy between the amount of damages sought in the complaint compared with the total amount of damage to the O'Carrolls' home; this, however, is irrelevant to our analysis.

10. In the Amended Complaint, Erie and the O'Carrolls also dismissed the claim against Ms. Kiawu.

County denied Erie's and the O' Carrolls' motion, granted the Council of Bridgeport's motion and entered judgment in its favor. Erie and the O'Carrolls appealed to the Court of Special Appeals on April 27, 2007.

### The Consolidated Appeal

The intermediate appellate court granted the parties' Joint Motion to Consolidate Appeals on September 19, 2007, and subsequently, this Court issued, on its initiative, a writ of certiorari prior to any proceedings in the intermediate appellate court. *Anderson v. Council of Unit Owners of The Gables on Tuckerman Condo.; Erie Ins. Exch. v. Council of Unit Owners of Bridgeport Condo.*, 402 Md. 352, 936 A.2d 850 (2007). The Appellants, Ms. Anderson, the O'Carrolls and Erie ("the Owners") presented the following issue:

> Does the Maryland Condominium Act, Md.Code Real Property, § 11–101 *et. seq.*, in particular, § 11–114, require a condominium association to repair or replace the damaged portions of an individual condominium unit following a casualty loss?

We hold that the Maryland Condominium Act does not require a condominium association to repair or replace property of an owner in an individual condominium unit after a casualty loss.

### II. Standard of Review

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Bednar v. Provident Bank of Maryland, Inc.*, 402 Md. 532, 542, 937 A.2d 210, 215 (2007); *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party"); *Harford County v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party");

*Serio v. Baltimore County,* 384 Md. 373, 388–89, 863 A.2d 952, 961 (2004); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs"). If no material facts are placed in genuine dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *See* Maryland Rule 2–501(f); [11] *Bednar,* 402 Md. at 532, 937 A.2d at 216; *Saks,* 399 Md. at 82, 923 A.2d at 6; *Prop. and Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 480, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006); *Ross v. State Bd. of Elections,* 387 Md. 649, 659, 876 A.2d 692, 698 (2005). In the present case, there is no genuine dispute of material fact.

In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v, Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre,* 402 Md. at 172, 935 A.2d at 708; *Kelly,* 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). Further, an interpretation should be given to the statutory provisions that does not lead to absurd conse-

---

11. Maryland Rule 2–501(f) states in part:

The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

quences. *See Roskelly v. Lamone,* 396 Md. 27, 53, 912 A.2d 658, 673 (2006); *So. Easton Neighborhood Ass'n v. Town of Easton,* 387 Md. 468, 495, 876 A.2d 58, 74 (2005); *Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003) ("[T]he statute must be given a reasonable interpretation, 'not one that is illogical or incompatible with common sense.' "). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre,* 402 Md. at 173, 935 A.2d at 709; *Kelly,* 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett,* 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater,* 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). If, however, the language is subject to more than one interpretation, or when the terms are ambiguous when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. *Barbre,* 402 Md. at 173, 935 A.2d at 709; *Kelly,* 397 Md. at 419–20, 918 A.2d at 482; *Smack,* 378 Md. at 305, 835 A.2d at 1179; *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 129, 756 A.2d 987, 991–92 (2000). When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the "purpose, aim, or policy of the enacting body," *Serio,* 384 Md. at 389, 863 A.2d at 961; *Drew v. First Guar. Mortgage Corp.,* 379 Md. 318, 327, 842 A.2d 1, 6 (2003), and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Bowen v. City of Annapolis,* 402 Md. 587, 613–14, 937 A.2d 242, 258 (2007); *Magnetti v. Univ. of Md.,* 402 Md. 548, 565, 937 A.2d 219, 229 (2007); *Clipper Windpower, Inc. v. Sprenger,* 399 Md. 539, 554, 924 A.2d 1160, 1168 (2007).

The ambiguity in this case results from comparison of the statutory language involving the coverage of a master policy held by the council of owners with the duty of the condominium council to repair the condominium. Under Section 11-114(a)(1), the council of owners is required to maintain insur-

ance on the entire condominium property, "the *common elements* and *units*, exclusive of improvements and betterments installed in *units* by unit owners," but under subsection (g), the council of owners is responsible for repairing or replacing "any portion of the condominium damaged or destroyed." (emphasis added). The word "unit" in (a)(1) creates the ambiguity upon which this dispute rests, and we must look at the entire regulatory scheme of the Condominium Act and its legislative history to illuminate the Legislature's intent. *See Kelly,* 397 Md. at 419–20, 918 A.2d at 482; *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *Smack,* 378 Md. at 305, 835 A.2d at 1179; *Chase,* 360 Md. at 129, 756 A.2d at 991–92.

## III. Discussion

A condominium is "an estate in real property" that "typically involves an apartment building or other structure consisting of two or more separate apartments or units," i.e., "horizontal property" or multi-story "stacked units." *See* 1 Patrick J. Rohan & Melvin A. Reskin, *Condominium Law and Practice* Section 1.03[1][a] (2007). *See also* 4 *Thompson* on Real Property 233 (2d ed. 1994) ("It has been stated that the condominium concept established the creation of a set of vertical boundaries separated into horizontal apartments, units, floors or stories."). However, as the notion of a condominium has evolved, it has come to also refer to "[t]own houses," "offices," and even "stores" with the appropriate recorded declaration, bylaws and condominium plat. 1 *Condominium Law and Practice* at Section 1.03[1][a]. *See also* Wendell A. Smith, *Creating a Planned Community: First Steps,* Probate & Property 18 (July/August 1993) ("The condominium form of ownership can be used for almost any type of physical structure, including multistory apartment buildings, attached townhouses, detached single-family dwellings or other nonresidential or mixed use projects.").

In *Ridgely Condominium Ass'n v. Smyrnioudis,* 343 Md. 357, 681 A.2d 494 (1996), we provided an overview of

the condominium form of ownership, explicating that an owner has a "hybrid property interest":

> A condominium is a "communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas." *Andrews v. City of Greenbelt,* 293 Md. 69, 71, 441 A.2d 1064 (1982).
>
> > The term condominium may be defined generally as a system for providing separate ownership of individual units in multiple-unit developments. In addition to the interest acquired in a particular apartment, each unit owner also is a tenant in common in the underlying fee and in the spaces and building parts used in common by all the unit owners.
>
> 4B Richard R. Powell, *Powell on Real Property* ¶ 632.1[4] (1996). A condominium owner, therefore, holds a hybrid property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements. *Andrews, supra,* 293 Md. at 73–74, 441 A.2d 1064; *see also Starfish Condo. v. Yorkridge Serv.,* 295 Md. 693, 703, 458 A.2d 805 (1983); *Black's Law Dictionary* 295 (6th ed.1990).

*Ridgely Condo. Ass'n,* 343 Md. at 358–59, 681 A.2d at 495 (footnote omitted). *See also Jurgensen v. New Phoenix Atlantic Condo. Council of Unit Owners,* 380 Md. 106, 115–16, 843 A.2d 865, 870 (2004).

The owner, therefore, possesses two distinct, separate property interests. She or he owns a fee interest in her or his individual property, comprising the exclusive right to use and occupy it. Discussing stacked-unit condominium regimes, Professor Richard R. Powell, in his treatise *Powell on Real Property,* defined the critical features of a condominium unit:

> One easy way to visualize a condominium unit is as a cube of air, the tangible boundaries of which are usually the finished side of the interior sheetrock, ceilings and floors.... [T]he condominium unit is generally seen by owners as the "inside" of their structure while the shell and "outside" of the building is a common element.... A typical condominium

unit consists of: the finished side of all interior walls, floors, partitions and ceilings; windows; kitchen cabinets and fixtures.

8 Richard R. Powell, *Powell on Real Property* Section 54A.01 [2] (2000); 1 *Condominium Law and Practice* at Section 1.03[1][b] ("The unit is also referred to as an airspace, i.e., a fixed block cut out of a three dimensional space. The airspace is owned by a unit owner, while other blocks of airspace above, below or beside the unit might be owned by other unit owners.") and Section 1.03[2][a] ("[T]he unit may be thought of as a block of airspace surrounded by walls, a floor and a ceiling. Often the legal description of the unit will utilize the walls, floor and ceiling as the legal boundaries of the airspace. In such a case, the unit's boundaries are established by the location of the walls, floor and ceiling. However, a unit's boundaries may not involve any part of the building.") (footnoted omitted). *See also Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners of Sea Watch Condo.*, 115 Md.App. 5, 11, 691 A.2d 750, 752–53, *cert. granted,* 347 Md. 253, 700 A.2d 1214, *and dismissed as improvidently granted,* 347 Md. 622, 702 A.2d 260 (1997), in which Judge Dale R. Cathell, then writing for the Court of Special Appeals, noted that, "All a condominium is, is a vertical, rather than horizontal, subdivision of one of the incidents of real property, the airspace.... [T]he condominium statutes did not create a new real property. They simply created another way to own airspace...." [12]

---

12. The Maryland Condominium Act defines "Unit" as,

> a three-dimensional space identified as such in the declaration and on the condominium plat and shall include all improvements contained within the space except those excluded in the declaration, the boundaries of which are established in accordance with § 11–103(a)(3) of this title. A unit may include 2 or more noncontiguous spaces.

Md.Code (1974, 2003 Repl.Vol.), § 11–101(p) of the Real Property Article. Section 11–103(a) provides the particulars that a declaration must express. Subsection (a)(3) states in pertinent part:

> A general description of each unit, including its perimeters, location, and any other data sufficient to identify it with reasonable certainty. As to condominiums created on or after July 1, 1981, except as provided by the declaration or the plat:

The owner also possesses an undivided percentage interest, as a tenant in common, with the other owners, in the condominium's common elements, which,

> may include the land, foundations, columns, supports, walls, roofs, halls, lobbies, stairs, entrances, recreational areas, parking lots, gardens and installations for utilities. The common interest represents the residual rights that the unit owners have in the property. The unit owners collectively own, as tenants in common, the entire condominium property, minus the airspaces consisting of the units. The rights to individual units are, in a sense, carved out of the tenancy in common.

1 *Condominium Law and Practice* at Section 1.03[1][b] (footnotes omitted). Common elements can be further subdivided into limited common elements, which are allocated for the exclusive use of one or more, but fewer than all, owners, such as, for example, designated parking spaces, balconies, terraces or patios, as well as general common elements, such as grounds and roads. *Id.;* 8 *Powell on Real Property* at Section 54A.01[2] ("Generally speaking, 'condominiums' equal units plus common elements owned by unit owners. 'Common elements' generally equal everything other than units....

---

(i) If walls, floors, or ceilings are designated as boundaries of a unit, all lath, furring, wallboard, plasterboard, plaster, paneling, tiles, wallpaper, paint, finished flooring, and any other materials constituting any part of the finished surfaces thereof are a part of the unit, and all other portions of the walls, floors, or ceilings are a part of the common elements.

(ii) If any chute, flue, duct, wire, conduit, or any other fixture lies partially within and partially outside the designated boundaries of a unit, any portion thereof serving only that unit is a part of that unit, and any portion thereof serving more than one unit or any portion of the common elements is a part of the common elements.

(iii) Subject to the provisions of subparagraph (ii) of this paragraph, all spaces, interior partitions, and other fixtures and improvements within the boundaries of a unit are a part of the unit.

(iv) Any shutters, awnings, window boxes, doorsteps, stoops, porches, balconies, patios, and all exterior doors and windows or other fixtures designed to serve a single unit, but located outside the unit's boundaries, are limited common elements allocated exclusively to that unit.

*Id.* at § 11–103(a)(3).

'Limited common elements' consist of those common elements whose usage is reserved for one or fewer than all unit owners. . . . Patios and decks may be limited common elements. The clubhouse, roads and grounds may be [general] common elements.") (footnote omitted). *See also Garfink v. Cloisters at Charles, Inc.,* 392 Md. 374, 391 n. 8, 897 A.2d 206, 216 n. 8 (2006) (noting that owners "can be said to have a tenancy in common in the general common elements, i.e., the exterior of her condominium unit, with all of the other Condominium unit owners"); *Sea Watch Stores,* 115 Md.App. at 40, 691 A.2d at 767 (stating that common elements would include the "portion of a partition wall between two units that is outside the boundaries of either unit").[13]

 We are called upon in this case to determine whether a condominium council of owners is required under the Maryland Condominium Act,[14] Section 11–101 *et. seq.* of the Real Property Article, Maryland Code (1974, 2003 Repl.Vol.), to repair or replace what has commonly been thought of as property included in an individual condominium unit, after a casualty loss. Specifically, this case involves Section 11–114, which imposes the duty upon the council of owners to maintain insurance on the entire condominium property, "the *common elements* and *units,* exclusive of improvements and better-

---

13. The Act defines "common elements" as all of the condominium except for the units. Md.Code (1974, 2003 Repl.Vol.), § 11–101(c) of the Real Property Article. "Limited common elements" are those which are "reserved for the exclusive use of one or more but less than all of the unit owners"; "General common elements" are those common elements that are not limited common elements. *Id.*

14. The Maryland Condominium Act "not only provides the legislative framework for establishing a condominium regime, but also the authority by which a condominium development can maintain and sustain its existence" and "the scope and duties of condominium development and ownership in Maryland." *Greenbriar Condo., Phase I Council of Unit Owners, Inc. v. Brooks,* 387 Md. 683, 716–17, 878 A.2d 528, 549 (2005); *Jurgensen,* 380 Md. at 115, 843 A.2d at 870 (stating that the Act "regulates the formation, management, and termination of condominiums in Maryland"). The affairs of a condominium are governed by a council of all owners. Md.Code (1974, 2003 Repl.Vol.), § 11–109(a) of the Real Property Article.

ments installed in *units* by unit owners," and also only impos-
es the duty that "[a]ny portion of the *condominium* damaged
or destroyed . . . be repaired or replaced promptly by the
council of unit owners." Maryland Code (1974, 2003 Repl.
Vol.), Section 11–114(a)(1) and (g) of the Real Property Article
(emphasis added).

Originally enacted as the Horizontal Property Act [15] by 1963
Maryland Laws, Chapter 387, Maryland's initial condominium
law contained a provision relating to insurance on the condo-
minium, which stated:

> The co-owners may, upon resolution of a majority, insure
> the building against risks, without prejudice to the right of
> each co-owner to insure his condominium unit on his account
> and for his own benefit. The premiums for such insurance
> on the entire building shall be deemed common expenses.

Maryland Code (1957, 1963 Supp.), Section 134 of Article 21.
Nonsubstantive amendments were made in 1972. *See* 1972
Maryland Laws, Chapter 349.

In 1974, the Act was recodified as Section 11–101 *et. seq.* of
the Real Property Article and renamed the Maryland Condo-
minium Act.[16] *See* 1974 Maryland Laws, Chapter 641. The
insurance provision was also amended to provide in part:

> (a) The declaration or bylaws may provide for the repair or
> reconstruction of a condominium in the event of damage to

---

**15.** Horizontal property refers to stacked or multi-story units. The 1963
Act defined "unit" as "an enclosed space, consisting of one or more
rooms, occupying all or part of a floor in buildings of one or more
floors or stories," and "condominium" as "the ownership of single
units in a multi-unit structure with common elements." Md.Code
(1957, 1963 Supp.), Art. 21, § 117A (b) and (c).

**16.** Chapter 641 of the Maryland Laws of 1974 also changed the defini-
tion of condominium to include town homes. As amended, "unit" was
defined as "a three dimensional area identified as such in the declara-
tion and on the condominium plat and shall include all improvements
contained within the area except those excluded in the declaration. A
unit may include two . . . or more non-contiguous areas." Md.Code
(1974, 1974 Supp.), § 11–101(j) of the Real Property Article. "Condo-
minium" was changed to "mean[ ] property subject to the condomini-
um regime established under this title." *Id.* at § 11–101(d).

all or part of the condominium, for insurance coverage on the condominium by the council of unit owners and by the individual unit owners, and for the allocation of available insurance proceeds for repair and reconstruction. . . .

(b)(1) Unless otherwise provided in the declaration or by-laws, in the event of damage to or destruction of a condominium, the council of unit owners promptly shall undertake to repair or reconstruct it, and all cost of the repair or reconstruction in excess of available insurance proceeds shall be a common expense.

Maryland Code (1974, 1974 Supp.), Section 11–111(a)–(b)(1) of the Real Property Article. Nonsubstantive amendments were made the following two years. *See* 1975 Maryland Laws, Chapters 108 and 786; 1976 Maryland Laws, Chapter 348.

In 1977, the Governor's Commission to Study the Laws Governing Condominiums ("the Commission" or "the Commission on Condominiums") was created by a Joint Resolution of the General Assembly to study problems that had developed in condominium multi-story buildings, their conversions and operations, including "developer sales representations, board of directors administrative problems, management company inexperience, and unit owner non-cooperation." Press Release, State of Maryland Commission on Condominiums, March 16, 1978.

In its preliminary report, issued during the 1978 legislative session, the Commission on Condominiums addressed many of the problems in multi-story developments regarding developers, councils of owners, management companies and owners in connection with new construction, conversions and resales of condominiums. Maryland Commission on Condominiums, Preliminary Report to the 1978 Session (March 16, 1978). Developers, the Commission noted, had been criticized for "fail[ing] to complete promised amenities," "under-estimating the cost of operation for the condominium," and "fail[ing] to turn over control of the project to unit owners." *Id.* The Commission also reflected upon complaints about councils of owners including "arbitrary, capricious or prejudiced action in

enforcement of covenants or rules" and "failure to enforce rules, architectural guidelines, or to protect the common areas against encroachment." *Id.* As to the management companies, the Commission iterated that those grievances involved the "failure to deliver promised management services or to monitor subcontractors to assure delivery of maintenance services" and "financial instability or failure, resulting in abrupt end of services to the condominium." *Id.* With respect to the owners, the Commission stated that owners had caused problems through "resistance to long-range financial planning or to the segregation of funds into reserve accounts for long-range repairs," "unilateral architectural alterations being made to commonly-owned exteriors or areas," "failure or refusal to pay regular assessments or fees," "failure to maintain unit[s], causing health, safety and/or aesthetic problems, and potential costs to other unit owners" and "apathy to association activities." *Id.* Owners also complained, the Commission explained, about "negligent or wilful damage to common areas, thus adding to expenses of association[s] and resulting in increased condo fees," recognition of the costs, incurred by the council of owners with respect to common areas, that were apportioned to all of the owners collectively. Finally, the Commission noted some general problems, including the "financial instability of condominium associations because of an absence of long-range financial planning and either failure to set aside reserve funds, or unwarranted dipping into them." *Id.* In 1979 and 1980, the Commission conducted meetings throughout the State to further explore the problems. Report of the Governor's Commission to Study the Laws Governing Condominiums (February 1981).

In 1981, as a result of the criticisms of multi-story apartment building conversions, the Commission proposed extensive restructuring and modification of the Condominium Act, which "drew from a number of sources including the Uniform Condominium Act," in order to abate concerns regarding apartment-to-condominium conversions and operations. *Id.* The General Assembly, thereafter, enacted legislation, the purpose of which was, in part:

FOR the purpose of specifying certain rights, duties, responsibilities and liabilities of lenders, unit owners, developers, and other persons and organizations having interests in condominiums; specifying powers and responsibilities of a condominium council of unit owners, and condominium board of directors; specifying certain conditions of sale of certain condominium units; specifying rights and duties of buyers and sellers of condominium units. . . .

1981 Maryland Laws, Chapter 246. *See also* Report on 1981 Condominium Bills to Legislative Services (describing condominium bill as "facilitat[ing] the orderly development of condominiums" and "contain[ing] safeguards to mollify any resultant adverse impact that conversions to condominium regimes might have on [tenants and unit owners]").

Among the changes was the addition of a statutory provision defining the maintenance, repair and replacement responsibilities of owners and the council of owners, ostensibly to address problems identified by the Commission, including owners' failures to maintain their own properties, "causing health, safety and/or aesthetic problems, and potential costs to other unit owners," as well as that owners were causing "negligent or wilful damage to common areas, thus adding to expenses of association and resulting in increased condo fees," and that councils of owners were "fail[ing] to enforce rules ... or to protect the common areas against encroachment." *See* 1981 Maryland Laws, Chapter 246. Substantially similar to Section 3–107(a) of the Uniform Condominium Act (1980),[17] the amendment charged, unless otherwise provided for in the declaration, the council of owners with responsibility "for maintenance, repair, and replacement of the common elements," while imposing upon each owner the duties of "main-

---

**17.** Section 3–107(a) of the Uniform Condominium Act (1980), in part, provided:

Except to the extent provided by the declaration, subsection (b), or Section 3–113(h), the association is responsible for maintenance, repair, and replacement of the common elements, and each unit owners is responsible for maintenance, repair, and replacement of his unit.

tenance, repair, and replacement of his unit." Maryland Code (1974, 1981 Repl.Vol.), Section 11–108.1 of the Real Property Article.[18] In response to the multi-story, apartment building condominium conversion concerns regarding the age of buildings and the economics of repair, the legislation also required the council of owners to obtain and maintain insurance on the entire condominium property, i.e., "the common elements and units, exclusive of improvements and betterments installed in units by unit owners." *See* 1981 Maryland Laws, Chapter 246. Mirroring Section 3–113 of the Uniform Condominium Act (1980),[19] Section 11–114, stated, in part:

---

**18.** The current version of Section 11–108.1 is substantively similar to the version enacted in 1981.

**19.** Section 3–113 of the Uniform Condominium Act (1980) stated in relevant part:

(a) Commencing not later than the time of the first conveyance of a unit to a person other than a declarant, the association shall maintain, to the extent reasonably available:

(1) property insurance on the common elements insuring against all risks of direct physical loss commonly insured against or, in the case of a conversion building, against fire and extended coverage perils. The total amount of insurance after application of any deductibles shall be not less than 80 percent of the actual cash value of the insured property at the time the insurance is purchased and at each renewal date, exclusive of land, excavations, foundations and other items normally excluded from property policies. . . .

\* \* \*

(b) In the case of a building containing units having horizontal boundaries described in the declaration, the insurance maintained under subsection (a)(1), to the extent reasonably available, shall include the units, but need not include improvements and betterments installed by unit owners.

\* \* \*

(d) Insurance policies carried pursuant to subsection (a) must provide that:

(1) each unit owner is an insured person under the policy with respect to liability arising out of his interest in the common elements or membership in the association;

(2) the insurer waives its right to subrogation under the policy against any unit owner or member of his household;

(3) no act or omission by any unit owner, unless acting within the scope of his authority on behalf of the association, will void the policy or be a condition to recovery under the policy; and

(4) if, at the time of a loss under the policy, there is other insurance in the name of a unit owner covering the same risk covered by the policy, the association's policy provides primary insurance.

\* \* \*

(f) An insurance policy issued to the association does not prevent a unit owner from obtaining insurance for his own benefit.

\* \* \*

(h) Any portion of the condominium for which insurance is required under this section which is damaged or destroyed shall be repaired or replaced promptly by the association unless (i) the condominium is terminated, (ii) repair or replacement would be illegal under any state or local health or safety statute or ordinance, or (iii)[80] percent of the unit owners, including every owner of a unit or assigned limited common element which will not be rebuilt, vote not to rebuild. The cost of repair or replacement in excess of insurance proceeds and reserves is a common expense. If the entire condominium is not repaired or replaced, (i) the insurance proceeds attributable to the damaged common elements must be used to restore the damaged area to a condition compatible with the remainder of the condominium, (ii) the insurance proceeds attributable to units and limited common elements which are not rebuilt must be distributed to the owners of those units and the owners of the units to which those limited common elements were allocated, or to lienholders, as their interests may appear, and (iii) the remainder of the proceeds must be distributed to all the unit owners or lienholders, as their interests may appear, in proportion to the common element interests of all the units. If the unit owners vote not to rebuild any unit, that unit's allocated interests are automatically reallocated upon the vote as if the unit had been condemned under Section 1–107(a), and the association promptly shall prepare, execute, and record an amendment to the declaration reflecting the reallocations. Notwithstanding the provisions of this subsection, Section 2–118 (Termination of Condominium) governs the distribution of insurance proceeds if the condominium is terminated.

Notably, Comment 2 to the Uniform Act, Section 3–113, stated:

Subsection (b) represents a significant departure from the present law in virtually all states by requiring that the association obtain and maintain property insurance on *both* the common elements *and* the units within buildings with **"stacked" units.** While it has been common practice in many parts of the country (either by custom or as mandated by statute) for associations to maintain property insurance on the common elements, it has generally not been the practice for the property insurance policy to cover individual units as well. However, given the great interdependence of the unit owners in the stacked unit condominium situation, mandating property insurance for the entire building is the preferable approach. . . . **The Act does not mandate association insurance on units in town house or other arrangements in which there are no stacked units.** However, if the developer wishes, the declaration may require association insurance as to units having shared walls or as to all units in the development. Many developments will have some units with horizontal boundaries and other units with no horizontal boundaries. In that case, association insurance as to the

(a) *Duty of council of unit owners to maintain property and liability insurance.*—Commencing not later than the time of the first conveyance of a unit to a person other than a declarant, the council of unit owners shall maintain, to the extent reasonably available:

(1) Property insurance on the common elements and units, exclusive of improvements and betterments installed in units by unit owners, insuring against all risks of direct physical loss commonly insured against or, in the case of a conversion condominium, against fire and extended coverage perils. The total amount of insurance after application of any deductibles may not be less than 80 percent of the actual cash value of the insured property, exclusive of land, excavations, foundations, and other items normally excluded from property policies; and

$$* \qquad * \qquad *$$

(c) *Provisions of property and liability insurance policies.*—Insurance policies carried pursuant to subsection (a) shall provide that:

(1) Each unit owner is an insured person under the policy with respect to liability arising out of his ownership of an undivided interest in the common elements or membership in the council of unit owners;

(2) The insurer waives its right to subrogation under the policy against any unit owner of the condominium or members of his household;

(3) An act or omission by any unit owner, unless acting within the scope of his authority on behalf of the council of unit owners, does not void the policy and is not a condition to recovery under the policy; and

(4) If, at the time of a loss under the policy, there is other insurance in the name of a unit owner covering the same

---

units having horizontal boundaries is required, but it is not necessary as to other units.
*Id.* (citation omitted) (some emphasis added).

property covered by the policy, the policy is primary insurance not contributing with the other insurance.

\* \* \*

(e) *Insurance for unit owner's benefit.*—An insurance policy issued to the council of unit owners does not prevent a unit owner from obtaining insurance for his own benefit.

\* \* \*

(g) *Repair or reconstruction.*—(1) Any portion of the condominium damaged or destroyed shall be repaired or replaced promptly by the council of unit owners unless:

(i) The condominium is terminated;

(ii) Repair or replacement would be illegal under any State or local health or safety statute or ordinance; or

(iii) 80 percent of the unit owners, including every owner of a unit or assigned limited common element which will not be rebuilt, vote not to rebuild.

(2) The cost of repair or replacement in excess of insurance proceeds and reserves is a common expense.

(3) If the entire condominium is not repaired or replaced:

(i) The insurance proceeds attributable to the damaged common elements shall be used to restore the damaged area to a condition compatible with the remainder of the condominium;

(ii) The insurance proceeds attributable to units and limited common elements which are not rebuilt shall be distributed to the owners of those units and the owners of the units to which those limited common elements were assigned; and

(iii) The remainder of the proceeds shall be distributed to all the unit owners in proportion to their common element interest.

(4) If the unit owners vote not to rebuild any unit, that unit's entire common element interest, votes in the council of unit owners, and common expense liability are automatically reallocated upon the vote as if the unit had been condemned under § 11–115 [§ 11–112], and the council of unit owners promptly shall prepare, execute, and record an

amendment to the declaration reflecting the reallocations. Notwithstanding the provisions of this subsection, § 11–123 governs the distribution of insurance proceeds if the condominium is terminated.

Maryland Code (1974, 1981 Repl.Vol.), Section 11–114 of the Real Property Article. Thereafter, between 1982 and 1989, the General Assembly made various minor and nonsubstantive changes to Section 11–114. *See* 1982 Maryland Laws, Chapter 836; 1984 Maryland Laws, Chapter 525; 1986 Maryland Laws, Chapter 360; 1989 Maryland Laws, Chapter 5.[20]

The Owners argue that Section 11–114 requires that the council of owners must provide insurance coverage for and be responsible for the repair and replacement of property in an individual condominium unit, after a casualty loss, and insist that Section 11–108.1 of the Act only requires that the owner

---

**20.** In 2001, the General Assembly modified Section 11–114 to clarify that if the cause of any damage to the condominium originates from the common elements, the council of owners' master policy deductible is a common expense, and that where the cause originates from another individual unit, if the bylaws so provide, the owner can be held responsible for damage to the condominium up to $1,000.00 of the deductible for the master policy. 2001 Md. Laws, Chap. 694. The amended portion, Section 11–114(g)(2), now provides:

(2)(i) 1. The cost of repair or replacement in excess of insurance proceeds and reserves is a common expense.
2. A property insurance deductible is not a cost of repair or replacement in excess of insurance proceeds.
(ii) If the cause of any damage to or destruction of any portion of the condominium originates from the common elements, the council of unit owners' property insurance deductible is a common expense.
(iii) 1. Except as otherwise provided in the council of unit owners' bylaws, if the cause of any damage to or destruction of any portion of the condominium originates from a unit, the council of unit owners' property insurance deductible is a common expense.
2. If the council of unit owners' bylaws provides that the owner of the unit where the cause of the damage or destruction originated is responsible for the council of unit owners' property insurance deductible, the unit owner's responsibility may not exceed $1,000.
3. The council of unit owners' property insurance deductible amount exceeding the $1,000 responsibility of the unit owner is a common expense.
Md.Code (1974, 1981 Repl.Vol., 2001 Supp.), § 11–114 of the Real Property Article.

perform ordinary maintenance, so that their "Condocover" insurance policies are irrelevant when a casualty loss is implicated. Essentially, the Owners argue that ordinary maintenance, repair and replacement rests upon an owner under Section 11–108.1, while repair and replacement following a casualty loss are the obligation of the council of owners under Section 11–114 and must be covered by the master policy.

The Councils, conversely, contend that Section 11–108.1 of the Act is controlling and that the individual owners are responsible for maintenance, repair and replacement of the damaged contents of their own units. They also argue that the Owners' reliance on the master policy, under Section 11–114, is misplaced because only the common elements and condominium structure are covered under the master policy.

When we examine the context of the entire Condominium Act, it becomes clear that the master insurance provision was intended to cover only damage sustained to the common elements or the structure of a condominium. Section 11–114(c) of the Act defines "insured person" under the council of owners' master policy, providing in part:

Insurance policies carried pursuant to subsection (a) of this section shall provide that:

(1) Each unit owner is an insured person under the policy with respect to liability arising out of his ownership of an undivided interest in the common elements or membership in the council of unit owners. . . .

Maryland Code (1974, 2003 Repl.Vol.), Section 11–114(c) of the Real Property Article. Each owner is not an insured person with respect to his or her individual interest in his or her own property, but rather, is insured under the master policy only as to his or her collective undivided interest in the entire condominium property. Thus, the master policy is meant not to insure each owner's property or individual unit, but to protect the common interests of all owners as co-owners of the entire condominium.

Additionally, Section 11–108.1 of the Condominium Act dictates the responsibilities for maintenance, repair and replacement of common elements and units; it states:

> Except to the extent otherwise provided by the declaration or bylaws, the council of unit owners is responsible for maintenance, repair, and replacement of the common elements, and each unit owner is responsible for maintenance, repair, and replacement of his unit.

*Id.* at Section 11–108.1. Section 11–108.1 of the Act thus recognizes the hybrid character of condominium ownership by differentiating between the treatment of common elements and the individual units, with the owner being responsible for damage to her or his "airspace," *Sea Watch Stores,* 115 Md.App. at 5, 691 A.2d at 752–53.

The Owners argue, nevertheless, that Section 11–108.1 is inapplicable and that the Section only pertains to repair and replacement of a unit in the course of ordinary maintenance, while Section 11–114 prescribes the council of owners' duty to repair and replace a unit in the event of a casualty loss. We disagree; if the Legislature intended to limit Section 11–108.1 as the Owners suggest, it could have fashioned the statutory language accordingly. Section 11–108.1 does not distinguish the duty of an owner to repair in the course of ordinary maintenance from the duty to repair following a casualty loss.

Moreover, the legislative history of Section 11–114 is informing. The original Horizontal Property Act, the ancestor of all of this, referred only to multi-story or stacked-unit buildings. In 1981, moreover, in response to a concern over condominium conversions of stacked-unit or multi-story buildings, specifically, that developers were not adding value to the apartment buildings that were being converted into stacked-unit condominium regimes, the General Assembly substantially revised the Condominium Act. Mirroring the Uniform Condominium Act (1980), the amendment called for the council of owners to maintain property insurance on the entire condominium, i.e., the common elements and units, and to repair or replace the damaged portion of the condominium in the event of a casualty loss. The Uniform Act noted that the addition of

the "common elements and units" language was a "significant departure from the present law":

> Subsection (b) represents a significant departure from the present law in virtually all states by requiring that the association obtain and maintain property insurance on *both* the common elements *and* the units within buildings with **"stacked" units.** While it has been common practice in many parts of the country (either by custom or as mandated by statute) for associations to maintain property insurance on the common elements, it has generally not been the practice for the property insurance policy to cover individual units as well. However, given the great interdependence of the unit owners in the stacked unit condominium situation, mandating property insurance for the entire building is the preferable approach.... **The Act does not mandate association insurance on units in town house or other arrangements in which there are no stacked units.** However, if the developer wishes, the declaration may require association insurance as to units having shared walls or as to all units in the development. Many developments will have some units with horizontal boundaries and other units with no horizontal boundaries. In that case, association insurance as to the units having horizontal boundaries is required, but it is not necessary as to other units.

Comment 2 to Section 3–113 of the Uniform Condominium Act (1980) (citation omitted) (some emphasis added). By adopting the "unit" language, ambiguity was created, but that ambiguity is banished by consideration of its historical context, i.e., that the framers were addressing problems involving "stacked units" in multi-story buildings where walls, floors and ceilings constituted the structure of the condominium, in addition to the outer walls. It is clear, moreover, that in town home condominium properties, where no stacked units exist, insurance on the individual town homes was not contemplated by the Uniform Act. *Id.*[21]

---

**21.** The Owners also argue before us that, under Section 11–114(g) of the Act, the property insurance deductible for the Council of Gables and

Our conclusion is also supported by Erie Insurance's own "Condocover" policy, in effect in the present cases, which provides in part:

> We will pay on your behalf the loss assessment charged by the condominium association for direct loss by a peril insured against in your basic policy. Anyone we protect and the other unit-owners must have an undivided interest in the damaged property.

> Under Dwelling Protection—Section I, the assessment must result from a direct loss to property, owned by all the property owners collectively, caused by any of the Perils We Insure Against.

Thus, Erie agrees that Section 11–114 only applies to damaged property owned by the owners collectively, and not by an individual owner.

The Owners' interpretation of the statute also would lead to illogical and absurd results by giving the council owners greater responsibility for losses within a unit than a landlord has on the property of a tenant, when the landlord owns the space, while the council of owners does not. *See Hemmings v. Pelham Wood Ltd. Liab. P'ship,* 375 Md. 522, 537, 826 A.2d 443, 452 (2003) (noting that in a landlord-tenants situation, ordinarily, when a landlord turns over control of a leased premises to a tenant, the landlord has no obligation to maintain the premises for the safety of the tenant). Additionally, the council of owners would be responsible for repairing or replacing property in a unit within which the council has no right to enter to make inspections or perform preventative maintenance. *See* Maryland Code (1974, 2003 Repl.Vol.), Section 11–125(e) of the Real Property Article (stating that the council of owners can only enter a unit to make repairs that "reasonably appear necessary for public safety or to prevent damage to other portions of the condominium"). As we have

---

the Council of Bridgeport condominium master insurance policies were common expenses to be shared among the owners as a whole; those provisions, however, apply only when the casualty loss falls under the umbrella of Section 11–114(a).

noted on many prior occasions, the General Assembly reasonably could not have intended such an illogical result. *See Ross*, 387 Md. at 667, 876 A.2d at 702 (rejecting statutory construction advocated by the State Board of Elections because it was " 'unreasonable, illogical, unjust, [and] inconsistent with common sense' ") (alteration in original); *In re Colby H.*, 362 Md. 702, 722, 766 A.2d 639, 649–50 (2001) (" '[C]onstruction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided.' "); *Comptroller of Treasury v. Gannett Co., Inc.*, 356 Md. 699, 716, 741 A.2d 1130, 1139 (1999) (stating that this Court should not attribute such an illogical intent to the General Assembly).

We conclude that the Maryland Condominium Act does not require the council of owners to repair or replace property of an owner in an individual condominium unit after a casualty loss. Thus, we affirm the judgments of the Circuit Court for Montgomery County and the Circuit Court for Prince George's County.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLEES.**