**Gen. 171]**                                                       **171**

## PROCUREMENT

PUBLIC ETHICS LAW – APPLICABILITY OF PROCUREMENT CONFLICT OF INTEREST PROVISIONS TO PUBLIC-PRIVATE PARTNERSHIPS AND OTHER ALTERNATIVE PROJECT DELIVERY METHODS

December 5, 2014

*Michael W. Lord*
*Executive Director*
*State Ethics Commission*

On behalf of the State of Maryland Ethics Commission, you ask whether public-private partnerships, "design/build" contracts, and certain other methods of obtaining goods and services are subject to the provision of the State Ethics Law that protects against conflicts of interest in the procurement process. *See* Md. Code Ann., Gen. Prov. ("GP") § 5-508. We conclude that they are, but where the restrictions of the Ethics Law conflict with statutory provisions specific to the type of procurement, the more specific provisions will control. Thus, as to public-private partnerships ("P3s"), where the provisions of Title 10A of the State Finance and Procurement Article expressly allow the government and potential offerors to discuss project specifications, those provisions will prevail over the provisions of GP § 5-508 that would otherwise prohibit such discussions. As to the other project delivery methods included within your request, we also conclude that GP § 5-508 applies, but where the statutory or regulatory provisions applicable to those methods allow coordination between the government and private parties that the Ethics Laws would otherwise prohibit, those specific provisions would prevail.

## I

## Background

### A. *The Evolution of the Traditional Procurement Process*

#### 1. Traditional Competitive Procurement

The development of public facilities or infrastructure has traditionally followed a familiar "design/bid/build" project delivery method in which each component of the project is separately procured and each component is substantially

completed before the next begins. For example, the development of a new State office facility might begin with a competitive process for design services to be provided by an architectural or engineering firm. The State drafts specifications, incorporates those specifications into a competitive solicitation, and firms submit competing proposals to provide those services. The State then evaluates the proposals, selects the successful proposer, and awards the contract.

Once the successful architectural or engineering firm has completed designs for the project, those designs form the basis of the procurement for the second stage of the process. Ordinarily, this second stage is also a competitive sealed bid process, though designed to obtain the services of a contractor that would provide the labor, materials, and services necessary to build what the architects and engineers designed. The solicitation in the second stage unfolds much like the first: The State provides specifications, advertises the opportunity to submit bids, and then reviews the bid proposals for responsiveness. The State selects the most favorable bid, awards the contract, and construction presumably gets underway. After the construction is complete, the State might proceed with a third or fourth stage to procure building operation or maintenance services.

Each stage of the traditional design/bid/build process is separately solicited, separately contracted, and separately approved. The separation of each stage is designed to foster competition among firms so that the State obtains the necessary goods or services at the lowest possible cost, thereby ensuring that the procurement, among other things, "get[s] the maximum benefit from the purchasing power of the State." Md. Code Ann., State Fin. & Proc. ("SFP") § 11-201(a)(7); *see also Blind Indus. and Servs. of Maryland v. Maryland Dep't of Gen. Servs.*, 371 Md. 221, 236 (2002). This has been the standard procurement model since the adoption of the Maryland procurement law in 1980. *See* 1980 Md. Laws, ch. 775.

The competitive sealed bid process is the preferred source selection method. *See* SFP § 13-102(a). Its focus on obtaining the lowest price for goods and services is well suited to acquiring office supplies, consumer products, or other goods and services where the primary factor for an award is price. Competitive sealed bidding, however, may not always be the best method for delivering large public works projects, and, in fact, can cause problems on highly complex projects. For example, it might be more efficient to use a procurement method that allows for the

construction firm to be involved early in the process so that it can coordinate with the design team to resolve constructability issues before construction begins. It might also be preferable to contract with a firm that is capable of providing both design *and* construction services at a combined lower cost than if those contracts were separately awarded and administered. And, because the stages of the competitive sealed bid procurement process occur in series, with each stage unfolding only after the previous one is complete, the ultimate delivery of the project can take a considerable period of time.

## 2. Alternative Project Delivery Methods

In response to some of the limitations of traditional procurement, State agencies have been authorized to employ various other methods of project delivery, such as competitive sealed proposals, design/build projects, "construction management at risk" contracts, and public-private partnerships. Although these approaches to government contracting take many different forms, they all permit agencies to better meet the needs of the State by providing greater flexibility, potential cost savings, and faster project completion.

One such alternative project deliver method is "design/build." Under the design/build method, a single contractor performs both the design and construction elements of a public infrastructure project. *See* SFP § 3-602(g)(1) (describing "design/build" contracts as those that involve "a single solicitation to design and build the facility"); COMAR 21.05.11.01B(1) (defining a design/build contract as "a project delivery method in which a single entity is contractually responsible for both design and construction of a project"). For example, the State might solicit proposals for an office building, but instead of first soliciting and completing the design for the building, and then soliciting and conducting construction, the design/build approach includes both services under a single solicitation. Both functions are thus performed by one contractor. The use of the design/build project delivery method is specifically permitted by, and governed by, the procurement regulations. *See generally* COMAR 21.05.11; *see also* SFP §§ 12-101 (authorizing the Board of Public Works to adopt procurement regulations); 3-602(g) (specifically authorizing capital project funding for "alternative construction methods" such as "design/build" contracts).

The "fast track" approach is another alternative project delivery model. Unlike the design/build method, which consolidates the design and construction functions into one procurement and one contractor, the fast track approach preserves the separation between the two procurement stages and project functions, but permits "design and construction [to be] implemented concurrently." SFP § 3-602(g)(2); *see also* COMAR 23.03.01.01B(17) (procurement regulations governing public school construction; explaining that, under the "fast track" approach, "portions of a project begin construction while other portions of the project are still in the design phase"). This approach might allow, for example, site work to commence and a building's foundation to be poured before the design for the remainder of the building is fully complete. The fast track approach is intended to be quicker and more flexible than traditional design/bid/build procurement, since both aspects of the project—design and construction—can be adjusted and performed synchronously.

A "Construction management at risk" ("CMR") contract is yet another alternative form of public project delivery. The State procurement regulations define CMR as:

> a project delivery method wherein a construction manager provides a range of preconstruction services and construction management services which may include, but are not limited to, cost estimation and consultation regarding the design of the project, prequalifying and evaluating trade contractors and subcontractors, awarding the trade contracts and subcontracts, scheduling, cost control, and value engineering.

COMAR 21.05.10.01B(1). The term "preconstruction services" is further defined as "services provided by the construction manager before construction which include, but are not limited to, constructability analysis, value engineering, scheduling, site assessments, and cost estimates." COMAR 21.05.10.01B(4); *see also Balfour Beatty Constr. v. Maryland Dep't of Gen. Servs.*, No. 957, Sept. Term 2013, __ Md. App. __, slip op. at 8 (Dec. 2, 2014).

The CMR model thus involves a competitive solicitation for a construction *manager* who will work with the architect or engineers—whose services are separately procured—from the

pre-construction project design phase through construction. In the pre-construction phase, the construction manager's responsibilities include value-engineering, budgeting, scheduling, and reviewing the drawings and specifications to identify any conflicts, errors, or ambiguities. Once a design is approved, the construction manager is responsible for ensuring that the project is constructed within a "guaranteed maximum price." COMAR 21.05.10.04. The construction manager thus assumes the risk for the cost, schedule, and performance of the trade contracts. *See* COMAR 21.05.10.05; *see also Balfour Beatty*, slip op. at 7-8; 92 *Opinions of the Attorney General* 65 (2007).

In the end, these project delivery methods are intended to offer greater efficiency, flexibility, and cost savings by allowing coordination between the design and construction aspects of a construction project. They do not, however, encompass the subsequent services that might be required to operate and maintain the building. Nor do they alter the traditional roles of the State as the owner and financier of the project, and the contractor as the provider of goods and services. Those additional characteristics are what distinguish these approaches—and the traditional step-by-step approach more generally—from public-private partnerships.

### B. Public-Private Partnerships

A public-private partnership—often referred to as a "P3"—typically involves a single procurement for a number of goods and services that would traditionally be procured separately (*e.g.*, design, construction, and operation and maintenance of a public facility) along with the delegation or sharing of traditionally public-sector responsibilities, such as financing or long-term ownership of the asset. Although P3s take different forms, they are commonly based on the expectation that they "can provide benefits by allocating responsibilities and risks to the party—either public or private—that is best positioned to undertake the activity and does so most efficiently and cost-effectively." *See* Joint Legislative & Executive Commission on Oversight of Public-Private Partnerships, Final Report to the Governor and General Assembly at 2 (Jan. 6, 2012) ("P3 Commission Report"). And by shifting a portion of the financing burden to the private sector, P3s are often seen as a way for states to address their infrastructure needs even in times of significant budgetary challenges. *Id.* at 1.

### 1. History of P3s in Maryland [1]

Public-private partnerships have been around in some form for centuries. Early American examples include state-chartered road and canal companies that constructed important infrastructure projects in exchange for the privilege of collecting tolls. *See* P3 Commission Report at 12; *see also*, *e.g.*, *Chesapeake & Ohio Canal Co. v. Baltimore & Ohio R.R. Co*., 4 G. & J. 1, 87-90 (1832) (discussing charter of the Potomac Company to build the C&O Canal).

Formal recognition of P3s as a distinct method of delivering public infrastructure is relatively new here in Maryland. It was not until 2010 that the General Assembly established a comprehensive statutory framework for both transportation and non-transportation P3s. *See* 2010 Md. Laws, chs. 640, 641. Before then, projects were either cobbled together based on existing statutory authority or based on legislative authority that developed piecemeal for particular projects. For example, the construction of public schools has been carried out through P3s pursuant to a statute specific to that type of project. *See*, *e.g.*, 2004 Md. Laws, chs. 306, 307.

During the latter half of the 1990s, the State began using P3s more systematically to provide transportation-related services. In 1996, our office issued an opinion concluding that the statute that created the Maryland Transportation Authority ("MdTA") also granted it the authority to enter into P3s for toll highways. 81 *Opinions of the Attorney General* 261 (1996). In 1997, MdTA established by regulation a "Transportation Public-Private Partnership Program" for non-highway projects, under the statutory authority of §§ 4-205 and 4-312 of the Transportation Article. COMAR 11.07.06. In 2004, the General Assembly implicitly acknowledged MdTA's authority to enter into transportation P3s by establishing oversight and reporting requirements for such contracts. *See* 2004 Md. Laws, ch. 430. Then, in 2007, the General Assembly expressly acknowledged that authority by extending similar oversight and reporting

---

[1] Much of the history that follows is based on the findings of the Joint Legislative and Executive Commission on Oversight of Public-Private Partnerships, which was created in 2010 to evaluate the statutory framework governing P3s. *See* P3 Commission Report at 17-20.

requirements to "public-private partnership arrangement[s]." 2007 Md. Laws, ch. 383.

The 2007 legislation created the first statutory definition of a public-private partnership, but it was limited to "the operation and maintenance of an existing or future toll or transit facility." 2007 Md. Laws, ch. 383. That definition proved too narrow to cover the proposed P3 for the Seagirt Terminal expansion,[2] which the Department of Legislative Services had concluded did not qualify as a "toll or transit facility" subject to the then-current law. P3 Commission Report at 18. Accordingly, the General Assembly imposed through the budget process a series of reporting requirements specific to the Seagirt project. *Id.* Then, throughout 2008 and 2009, when the Department of General Services ("DGS") was formulating the State Center project,[3] the Legislature enacted various provisions in operating and capital budget bills to provide legislative oversight of projects, like State Center, that were often referred to as P3s but were actually projects executed under traditional authority (*e.g.*, land disposition statutes). *See* H.B. 560, 2013 Leg., Reg. Sess., Revised Fiscal and Policy Note at 11.

This piecemeal approach proved sufficient for the Seagirt Marine Terminal, but legal challenges to both the State Center project and the reconstruction of the I-95 travel plazas[4]

---

[2] In 2009, the Maryland Port Administration awarded a 50-year lease of this deep-draft marine terminal to Ports America Chesapeake ("PAC"). In exchange, PAC reimbursed the $140 million that the State spent to construct the terminal in 1990, committed to certain annual payments, and agreed to develop a deeper, 50-foot berth to accommodate the larger ships expected following the widening of the Panama Canal then projected for 2014. P3 Commission Report at 14.

[3] The State Center project involves the redevelopment of the 28-acre State Center complex in Baltimore City into a mixed-use, transit-oriented development with residential, office, and retail space. The project—which has been under consideration since at least 2004—contemplates a mix of long-term leases or fee simple dispositions of the property to a private developer, which will undertake to redevelop the complex. In conjunction with the land disposition, the State contemplates leasing office space alongside private tenants in the mixed-use complex. *See* P3 Commission Report at 15; *State Center*, *LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451 (2014).

[4] In 2011, MdTA issued a request for proposals to finance, redevelop, operate, and maintain the Maryland House and Chesapeake

highlighted the need for comprehensive P3 legislation. *See State Center*, 438 Md. 451 (dismissing, as barred by laches, suit challenging contract for non-compliance with general procurement provisions of Division II); *Host Int'l*, *Inc. v. Maryland Transp. Authority*, Case No. 24-C-12-001507, 2012 WL 6677791 (Cir. Ct. Balt. City, Nov. 5, 2012) (finding that the travel plaza P3, which was proceeding under former § 4-406 of the Transportation Article, was exempt from the Maryland General Procurement Law).

Comprehensive P3 legislation came in the 2010 legislative session. Chapters 640 and 641 established for the first time a statutory framework for *all* P3s, regardless of the context in which they might arise. The legislation slightly modified the definition of P3s, created new provisions for P3s in the State Finance and Procurement Article (§§ 10A-101, 10A-102) and the Transportation Article (§ 4-406), and enacted provisions requiring notification and analysis of the project's impact on State debt. The legislation authorized all State agencies to enter into P3s and imposed reporting requirements for all P3 projects. It identified six "reporting agencies"—DGS, the Maryland Department of Transportation ("MDOT"), the University System of Maryland, St. Mary's College of Maryland, Morgan State University, and Baltimore City Community College—that were required to notify the public and the General Assembly of their intent to pursue a P3 and report annually to the Legislature on its progress. SFP §§ 10A-101(g), 10A-104(a), 10A-202. DGS was designated as the reporting agency for any P3 projects entered into by State agencies that are not themselves reporting agencies.

The 2010 legislation also created the Joint Legislative and Executive Commission on Oversight of Public-Private Partnerships to evaluate the statutory framework governing P3s. The Commission submitted its final report in January 2012; it recommended revising several statutory definitions, creating a statement of public policy for the use of P3s, and requiring that all P3s include certain contract provisions. *See generally* P3 Commission Report. Legislation based on the Commission's recommendations was introduced in the 2012 session and heavily

---

House—the two travel plazas that MdTA owns in the median of I-95. In exchange for a 35-year lease, the winning contractor agreed to renovate or replace the aging facilities, operate them, provide the State with an annual return, and transfer the facilities back to the State at the end of the lease term. P3 Commission Report at 14.

amended but ultimately failed to pass. *See* S.B. 358/H.B. 576 (2012). Similar legislation incorporating many of the 2012 amendments was introduced during the 2013 session and was ultimately enacted. *See* 2013 Md. Laws, ch. 5.

### 2. *Current Maryland Law on P3s*

Several aspects of the 2013 legislation bear mention here. First, the Legislature included a broad statement of public policy in favor of utilizing P3s to strengthen "public infrastructure assets," apportion risk between the public and private sectors, foster the creation of jobs, and promote the "socioeconomic development and competitiveness of Maryland." SFP § 10A-102(a). The Legislature also provided the first single, comprehensive definition of a P3:

> "Public-private partnership" means a method for delivering public infrastructure assets using a long-term, performance-based agreement between a reporting agency and a private entity where appropriate risks and benefits can be allocated in a cost-effective manner between the contractual partners in which:
>
> (i) a private entity performs functions normally undertaken by the government, but the reporting agency remains ultimately accountable for the public infrastructure asset and its public function; and
>
> (ii) the State may retain ownership in the public infrastructure asset and the private entity may be given additional decision-making rights in determining how the asset is financed, developed, constructed, operated, and maintained over its life cycle.

SFP § 10A-101(f).

Apparently in recognition of the fact that P3s often include the disposition or long-term use of State property, the Legislature placed the new P3 provisions within Division I of the State Finance and Procurement Article—where other provisions governing the disposition of State property lie, *see*, *e.g.*, SFP §§ 10-304 and 10-305—and not within the procurement

provisions of Division II. *See generally* SFP Title 10A; *see also* SFP § 10A-101(f)(2)(ii) (stating that "'Public-private partnership' does not include . . . a procurement governed by Division II of this article"). The General Assembly nevertheless made certain provisions of the procurement law specifically applicable to P3s, such as the provisions relating to collusion, falsification, required nondiscrimination clauses, security for construction contracts, and prevailing and living wage requirements. SFP § 11-203(h)(2). The statute also includes reporting requirements, § 10A-104, provisions specific to solicited and unsolicited proposals, §§ 10A-201 through 10A-301, and a list of terms that must be included in all P3 agreements. § 10A-401.

Pursuant to the statute, the P3 process requires the submission of a "presolicitation report" to the Comptroller, the State Treasurer, the budget committees of the General Assembly, and the Department of Legislative Services. SFP § 10A-201(a). The presolicitation report must "state the specific policy, operational, and financial reasons for pursuing a public-private partnership" and the "risks and benefits" of doing so. SFP § 10A-201(b). It also must include—"if relevant and to the extent possible"—a "preliminary summary of the proposed solicitation process" and "a statement of intention to use the exemption from the requirements of Division II" set forth in SFP § 11-203. SFP § 10A-201(b)(1)(iv).

The budget committees then have 45 days (60 days for larger proposals) to review and comment on the presolicitation report,[5] at which point the reporting agency must "seek the official designation by the Board of Public Works of the public infrastructure asset as a public-private partnership and approval of the solicitation method." SFP § 10A-201(c). After receiving the Board's designation, the reporting agency publishes a "public notice of solicitation," which initiates the process of selecting the private-sector partner. SFP § 10A-202.

The selection process is conducted by way of a "public notice of solicitation," which can include a request for qualifications, a request for expressions of interest, a request for

---

[5] The budget committees do not, however, have statutory authority to "approve" or "veto" specific P3 projects. As we have previously stated, legislative veto provisions are of "questionable constitutionality." 85 *Opinions of the Attorney General* 190, 203 (2000); *see I.N.S. v. Chadha*, 462 U.S. 919 (1983).

proposals, or any combination thereof. *See* SFP § 10A-101(e). If a "request for qualifications" is utilized, the agency solicits potential bidders to describe, among other things, their technical ability to carry out the proposed project. *See* SFP § 10A-202(b)(1). This early stage of the P3 process would unfold much like a Division II procurement, which involves only limited and tightly controlled discussion between the procuring unit and the potential bidders. *See* COMAR 21.05.02.07 (providing for pre-bid conferences, but no *ex parte* discussions, in competitive sealed bid procurements); 21.05.03.03C (in competitive sealed proposal procurements, providing for *ex parte* discussions with qualified offerors in a manner that affords "fair and equal treatment" to offerors). After the bidders are qualified, however, the P3 statute specifically authorizes more extensive dialogue between the agency and qualified bidders:

> (2) After a bidder is qualified and at any time before the award of the public-private partnership agreement, a reporting agency may engage in discussions with qualified bidders.
>
> (3) These discussions may be held to:
>
>   (i) obtain comments and make revisions to solicitation documents;
>
>   (ii) obtain the best value for the State; and
>
>   (iii) ensure full understanding of:
>
>     1. the requirements of the State, as set forth in the request for proposals; and
>
>       2. the proposal submitted by the bidder.

SFP § 10A-202(b); *see also* P3 Commission Report at 43 (stating that "the review of P3 proposals may require alternative evaluation criteria and review processes not allowed by existing procurement laws, such as the use of best and final offers, negotiation with bidders, the shortlisting of bidders, or selection based on qualifications or best value").

These discussions allow the State to work with bidders to improve the solicitation so that the project ultimately provides "best value to the State" while still being commercially competitive and financeable. At the same time, the discussions take place under conditions that are transparent and structured.

The process for soliciting, evaluating, and selecting the bids is approved by the Board of Public Works, SFP § 10A-201(c)(2), and the reporting agency issues a public notice of the solicitations. SFP § 10A-202(a). After the agency has completed its discussions with the bidders and revised the solicitation to reflect their input, it issues a request for proposals, evaluates the proposals it receives, and recommends an awardee.[6] The agency posts the agreement online, and submits it to the Comptroller, the State Treasurer, the budget committees, and the Department of Legislative Services for their review. SFP § 10A-203(a), (b)(2). After those reviews, the agreement is presented to the Board of Public Works for its review and approval. SFP § 10A-203(a).[7]

## C.    *Section 5-508 of the Maryland Public Ethics Law*

The Maryland Public Ethics Law is codified at §§ 5-501 through 5-1001 of the General Provisions Article.[8] Its purpose is to "guard[] against improper influence" over public officials by requiring disclosure of certain financial affairs and by setting certain "ethical standards for the conduct of State and local business." GP § 5-102(b). The subtitle has a number of provisions that generally prohibit an individual (or that individual's

---

[6] In recognition of the potential that even a rejected proposal may contain valuable work product, the statute authorizes the reporting agency to reimburse a private entity for the cost incurred in preparing a response to a P3 solicitation. SFP § 10A-202(f).

[7] MDOT has since promulgated regulations to elaborate on the solicitation process for transportation P3s. *See* COMAR 11.01.17. It is our understanding that, as of the date of this opinion, other agencies identified as "reporting agencies" under the P3 statute are in the process of preparing their own P3 regulations.

[8] At the time of your request, the Ethics Law was set forth at Title 15 of the State Government Article, and the specific provision we interpret here appeared as § 15-508. As part of the code revision process, the Ethics Law and several other statutes within the State Government Article were moved into the new General Provisions Article effective October 1, 2014. A few changes to the provision were made to conform certain references to defined terms and for stylistic purposes. GP § 5-508 (Revisor's Note). Those changes do not bear on the issue before us and, in any event, are considered non-substantive "absent the clearest legislative intent." *See Nationwide Mutual Ins. Co v. United States Fidelity & Guaranty Co.*, 314 Md. 131, 147 (1988) (quoting *McGarvey v. State*, 311 Md. 233, 242 (1987)). Except where indicated, we will refer to the procurement ethics provision by its current citation: GP § 5-508.

employer) from participating in a governmental matter when that individual has a personal interest in the outcome of the matter.

The Ethics Law also contains a specific provision, § 5-508, that is focused entirely on procurement ethics:

> § 5-508  Participation in Procurement
>
> (a) In General – An individual who assists an executive unit in the drafting of specifications, an invitation for bids, a request for proposals for a procurement, or the selection or award made in response to an invitation for bids or request for proposals, or a person that employs the individual, may not:
>
> (1) submit a bid or proposal for that procurement; or
>
> (2) assist or represent another person, directly or indirectly, who is submitting a bid or proposal for that procurement.

GP § 5-508(a).  As the Ethics Commission has previously stated, the purpose of the procurement ethics provision is to prevent a contractor from gaining an unfair advantage by assisting the procurement agency in defining the project "and then later competing for the contract which it assisted in defining."  State Ethics Comm'n Advisory Op. No. 01-03.

Subsection (b) exempts certain activities that do not qualify as "assisting in the drafting of specifications, an invitation for bids, or a request for proposals for a procurement":

> (1) providing descriptive literature such as catalogue sheets, brochures, technical data sheets, or standard specification "samples," whether requested by an executive agency or provided unsolicited;
>
> (2) submitting written or oral comments on a specification prepared by an executive unit or on a solicitation for a bid or proposal when comments are solicited from two or more persons as part of a request for information or a prebid or preproposal process;

(3) providing specifications for a sole source procurement made in accordance with § 13-107 of the State Finance and Procurement Article;

(4) providing architectural and engineering services for:

(i) programming, master planning, or other project planning services; or

(ii) the design of a construction project if:

1. the design services do not involve lead or prime design responsibilities or construction phase responsibilities on behalf of the State; and

2. A. the anticipated value of the procurement contract at the time of advertisement is at least $2,500,000 and not more than $100,000,000; or

B. regardless of the amount of the procurement contract, the payment to the individual or person for the design services does not exceed $500,000; or

(5) for a procurement of health, human, social, or educational services, comments solicited from two or more persons as part of a request for information, including written or oral comments on a draft specification, invitation for bids, or request for proposals.

GP § 5-508(b).

Administering these procurement ethics provisions can prove challenging within the context of a traditional step-by-step procurement, where the competitive stages of the procurement process are isolated and more easily recognized. The task becomes more difficult still in the context of P3s and other project delivery methods, where these stages are collapsed or are occurring simultaneously.

The concern you have raised is that these project delivery methods might violate the subsection (a) prohibition on assisting an executive unit with specifications or a solicitation and then competing on that same solicitation. Specifically, we understand your concern to be that, in the case of P3s, the State unit and the

contractor often discuss the terms and specifications of the solicitation and the provisions of the eventual contract during the solicitation process, and yet that same contractor is then permitted to compete on the solicitation. In the case of design/build, fast track, and construction management at risk procurement, there is a perception that the contractor works alongside the State unit on developing design specifications, construction terms, and the ultimate contracts and pricing. The Commission seeks our guidance in determining whether § 5-508 applies to P3s and these alternative construction methods and, if so, whether the discussions they allow violate that provision's conflict of interest restrictions.[9]

## II

## Analysis

### A  *Whether the Restrictions on Participation in Procurement in GP § 5-508 Apply to Public-Private Partnerships*

The question you ask requires us to interpret the Ethics Law and its interplay with Title 10A and Division II of the State Finance and Procurement Article. As is always the case, the cardinal rule of statutory construction is "to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). The process of identifying legislative intent begins with "the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Anderson v. Council of Unit Owners of Gables on Tuckerman Condo.*, 404 Md. 560, 571 (2008) (internal quotation marks and citations omitted). If the language is ambiguous when viewed within "a larger statutory scheme," the ambiguity is resolved "by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute." *Id.* at 572. In doing so, provisions dealing with the same subject must be harmonized, if possible, so that each may be given effect. *Id.*

---

[9] In accordance with established policy, this Office defers to the Commission on the interpretation of the Ethics Law and for that reason typically does not entertain opinion requests concerning the meaning of that law. That policy is not implicated here, however, because the opinion the Commission asks us to provide relates in large part to interpretation of the State Finance & Procurement Article.

We must also be mindful that both the Legislature and the Judiciary have directed that the Ethics Law be given a liberal construction. *See* GP § 5-102(c) ("The General Assembly intends that this title, except for its criminal sanctions, be liberally construed to accomplish [the purpose stated in § 5-102(b)]."); *Carroll County Ethics Comm'n v. Lennon*, 119 Md. App. 49, 71 (1998).

### 1. The Plain Language of the Operative Statutory Provisions

We start with the conflict of interest provisions in § 5-508(a) of the Ethics Law. They prohibit someone from submitting a bid or proposal for a procurement when they have "assist[ed] an executive unit in the drafting of specifications, an invitation for bids, [or] a request for proposals for a procurement." They also prohibit someone who has submitted a bid "for that procurement" from participating in "the selection or award made in response to an invitation for bids or request for proposals." The first step in our analysis, then, is to determine whether P3s constitute "procurement."[10]

Although "procurement" is not defined in the Ethics Law, the term "procurement contract" is: "'Procurement Contract' has the meaning provided in § 11-101 of the State Finance and Procurement Article." GP § 5-101(ee). That provision in turn defines "procurement contract" as "an agreement in any form entered into by a unit for procurement." SFP § 11-101(n)(1). Section 11-101(m) defines the term "procurement":

> "Procurement" means the process of . . . leasing real or personal property as lessee [or] buying or otherwise obtaining supplies

---

[10] Section 5-508(b) identifies certain actions that are not considered "assisting in the drafting of specifications, an invitation for bids, or a request for proposals for a procurement" and, thus, are exempt from the prohibition in subsection (a): (1) providing descriptive literature; (2) submitting comments on a specification as part of a broad solicitation of such comments; (3) providing specifications for a sole source procurement; (4) providing architectural and engineering services for certain types of projects, and (5) providing comments when the agency has solicited such comments from two or more persons as part of a procurement of health, human, social or educational services. GP § 5-508(b). Although individual P3s might fall under one or more of these exemptions, none covers P3s as a category.

> (or services) . . . and . . . includes the solicitation and award of procurement contracts and all phases of procurement contract administration.

SFP § 11-101(m)(1) and (2). Putting all of this together, the applicability of the Ethics Law comes down to whether a P3 qualifies as a "process of . . . buying or otherwise obtaining supplies (or services)."[11] We think that it does.

We believe it is significant that the definition of "procurement contract" in the Ethics Law uses the phrase "*meaning* provided in" Division II rather than a procurement contract "governed by" or "subject to" Division II. That choice of words suggests that the Ethics Law is not concerned with the technical statutory *authority* under which a transaction proceeds, but with the *nature* of that transaction. In other words, the Ethics Law applies to procurement whether or not that procurement is subject to the specific requirements of Division II.

From this standpoint, a P3 would seem to qualify as procurement. Although a P3 agreement often includes "functions normally undertaken by the government" (*i.e.*, how the property is "financed" or "owne[d]," SFP § 10A-101(f)), it also involves activities that would be the subject of a traditional procurement, namely, how the public project is "developed, constructed, operated, and maintained." *Id.* Inasmuch as procurement— whatever method of source selection is used—includes the acquisition of private-sector goods and services with public funds, it seems to us that P3s, or at least a significant portion of a P3, involves procurement.

The definition of "public-private partnership" in the P3 law, though it uses somewhat different terms, is not inconsistent with the definition of "procurement." At its most basic level, the P3 law describes a "public-private partnership" as a "method for delivering public infrastructure assets" that meets certain criteria. SFP § 10A-101(f). Although "*delivering* public infrastructure assets" might seem different from the "process of . . . *buying or otherwise obtaining* supplies (or services)," the difference is largely semantic. Under a P3, "delivering" a modernized

---

[11] The portion of the definition that addresses the State's leasing of property does not apply here.

shipping terminal or light rail transit line necessarily involves "obtaining" goods and services from the private sector. In the absence of a P3, many of those goods and services would be the subject of a traditional procurement contract.

The similarities between P3s and procurement are not limited to the substance of what they provide; P3s also unfold much like Division II procurements. P3s involve a solicitation, SFP § 10A-101(e); require a competitive solicitation process, evaluation, and award, §§ 10A-103(b), 10A-202; require the agency to make a responsibility determination about the proposers, §§ 10A-101(h), 10A-202; and are formalized in a written agreement. §§ 10A-103(a), 10A-203, and 10A-401. P3s are subject to the same security and prevailing wage requirements that apply to other State procurement, *see* §§ 10A-105(b) (incorporating the requirements of SFP Title 17, Subtitles 1 and 2); require application of the same disadvantaged and minority business contracting provisions, *see* § 10A-403; and are subject to a number of Division II requirements that apply to traditional procurement as well. *See* § 11-203(h)(2). In all of these respects, the P3 functions much as a Division II Procurement.

### 2.    Place Within Statutory Scheme

Having concluded that P3s qualify as "procurement" at least under a functional definition of the term, we turn next to the activities that are excluded from the definition of "public-private partnership" to see whether they alter that conclusion. SFP § 10A-101(f) provides:

> (2) "Public-private partnership" does not include:
>
> (i) a short-term operating space lease entered into in the ordinary course of business by a unit of State government and a private entity and approved under § 4-321 or § 12-204 of this article;
>
> (ii) *a procurement governed by Division II of this article*;
>
> (iii) public-private partnership agreements entered into by the University System of Maryland, St. Mary's College of Maryland, Morgan State University, or Baltimore City Community College, where

no State funds are used to fund or finance any portion of a capital project; or

(iv) a revenue-producing transportation facility under 21.01.03.03B(1)(d) of the Code of Maryland Regulations that is not a public-private partnership as defined under paragraph (1) of this subsection.

SFP § 10A-101(f)(2) (emphasis added). Although three of the four exclusions are not relevant, the second, italicized above, merits further consideration because it could arguably indicate that a P3 is not "procurement."

We do not read the italicized provision as meaning that a P3 is not a "procurement." That might be a plausible reading if all procurement was "governed by Division II," but that is not the case; the General Assembly has identified some 24 types of procurement (or procurement by particular government entities) that are excluded from Division II, subject to certain exceptions. *See* SFP § 11-203. Nor do we read subparagraph (f)(2)(ii) as exempting P3s from Division II. That role is already played by SFP § 11-203, which governs the extent to which P3s must comply with Division II:

(h)(1) Except as provided in paragraph (2) of this subsection, this division does not apply to a public-private partnership under Title 10A of this article.

(2) To the extent otherwise required by law, the following provisions of this division apply to a public-private partnership under Title 10A of this article:

(i) §11-205 of this subtitle ("Collusion");

(ii) §11-205.1 of this subtitle ("Falsification, concealment, etc. of material facts");

(iii) Title 12, Subtitle 4 of this article ("Policies and Procedures for Exempt Units");

(iv) § 13-219 of this article ("Required clauses – Nondiscrimination clause");

(v) Title 17, Subtitle 1 of this article ("Security for Construction Contracts");

(vi) Title 17, Subtitle 2 of this article ("Prevailing Wage Rates – Public Work Contracts"); and

(vii) Title 18 of this article ("Living Wage").

SFP § 11-203(h).  As this provision plainly states, P3s, as a category, are not entirely exempt from Division II.

Instead, we read SFP § 10A-101(f)(2)(ii) as clarifying that a standard Division II procurement is not *also* subject to the provisions of Title 10A.  The language of (f)(2) states that the listed activities are not "include[d]" within the definition of "public-private partnership."  The use of the term "include" suggests that the General Assembly did not intend to *define* P3s by the extent to which they are subject to Division II, but, rather, intended simply to exclude from the definition of P3s those procurements that are wholly governed by Division II.

The Joint Legislative & Executive Commission Report bears this out.  It states that the exception "clarifies that procurements for goods and services, like contracts for operation or maintenance, are not included in the definition of a P3."  P3 Commission Report at 27.  These procurements are, and always were, to be governed by Division II and not by the proposed P3 provisions.  *Id*. at 26.  Again, the purpose of (f)(2)(ii) is not to exempt P3s from Division II or otherwise define them as something other than procurement, but to make clear that procurements governed by Division II are not P3s subject to the various reporting and review requirements of Title 10A.

There was good reason for the Legislature to clarify that the provisions of Title 10A do not apply to traditional procurement.  For example, the State might want to separately procure the services of a construction company to install a parking lot at the same time that it is engaged in a P3 for the government building that would be served by that lot.  Because the parking lot procurement would arguably be a "method for delivering public infrastructure assets," the question might arise as to whether the parking lot procurement would also be subject to the notification and reporting requirements of the P3 statute by virtue of its relationship to the P3.  Subparagraph (f)(2)(ii) answers that question.  We thus conclude that a functional definition of the term "procurement" includes P3s, and that the statutory provisions governing the extent to which P3s are subject to Division II do not alter that conclusion.

### 3. Legislative History

We turn next to the legislative histories of the two statutes at issue here to see whether they shed light on the tentative conclusions we have reached thus far. We have examined the legislative history of both the Ethics Law provisions of GP § 5-508, enacted in 1994, and the P3 provisions of Title 10A of the State Finance and Procurement Article, enacted in 2013. With one limited exception, discussed below, none of the materials in the bill files directly addresses the interplay between the two statutes. The materials surrounding the earlier enactment suggest, however, that the General Assembly intended ethics provisions to apply broadly to what the Legislature perceived to be a trend toward increasing private involvement in procurement matters. The materials surrounding the later enactment indicate that the Legislature was aware that § 5-508 would apply but, ultimately, opted not to change the interplay between the two statutes.

### a. GP § 5-508 (1994 Md. Laws, ch. 678)[12]

The legislative history of the procurement ethics provisions does not address the applicability of those provisions to P3s. As discussed above, P3s were not comprehensively addressed by statute until 2010, *see* 2010 Md. Laws, chs., 640, 641, some 16 years *after* the procurement ethics provisions were enacted. In fact, the enactment of what is now GP § 5-508 preceded by two years even our earlier opinion concluding that the Maryland Transportation Authority had its own statutory authority to enter into P3s for toll highways. 81 *Opinions of the Attorney General* at 261. It comes as no surprise, then, that the legislative history of the ethics provisions does not address our issue.

That history does, however, more generally address concerns about the conflicts of interest that arise when private entities become involved in the administration of the procurement process. Those concerns are reflected in the report of the Joint Task Force on Maryland Procurement, which was appointed in the fall of 1993 to "undertake a review of Maryland's procurement laws and regulations" and, among other things,

---

[12] The provision was originally codified as Article 40A, § 3-110, and then recodified as § 15-508 of the State Government Article in 1995. As discussed above, it was recodified again in 2014 and now appears in § 5-508 of the General Provisions Article.

"consider what additional safeguards were warranted to prevent abuse or the appearance of improper influence within the procurement system." Letter from Clarence W. Blount *et al.* to Hon. Thomas V. Mike Miller, Jr. *et al.* (Feb. 17, 1994) (included within the Report of the Joint Task Force on Maryland Procurement (Feb. 1994) ("Task Force Report")). Specifically, the Task Force observed:

> In recent years, there seems to be a trend toward the creation of ad hoc groups to lend expertise in the procurement process for major and complex contracts. The conflict occurs if an individual has participated in an ad hoc group charged with the development of specifications and requests for proposals or invitation for bids. Such groups do not fall within the definition of "executive agency" and are thus not necessarily precluded from participating in that procurement. Additionally, other examples of potential conflicts arise when a consultant or other interested party participates in the development of findings and recommendations on behalf of an Executive Branch study group, and is in a position to suggest recommendations that may benefit their interests.

Task Force Report at 31. Two aspects of this passage, and the Task Force Report more generally, are enlightening. First, the Task Force was concerned about a "trend" toward the use of private-sector expertise to assist in the drafting of specifications, requests for proposals, and invitations for bids when preparing "major and complex" public contracts. Although none of the contracts that the Task Force identified as being of specific "public concern" appear to have involved P3s or other innovative project delivery methods,[13] it seems likely that the same concerns

---

[13] The Task Force identified "six areas where public concerns were raised as to the workings of the State's procurement system (the keno amendment to the State lottery contract, the purchase of MEDEVAC helicopters, the development of a distance learning network, the purchase of home detention equipment, the award of the Vehicle Emissions Inspection Program (VEIP) contract, and the supplemental retirement plan contract)." Task Force Report at 8.

the Task Force described would arise with respect to design/build contracts, P3s, and the other innovative procurement methods described above.

Second, the specific concern that the Task Force had about the use of private-sector expertise in the procurement process was that it could potentially allow bidders to gain a competitive advantage by participating in the formulation of specifications. The Task Force did not seem opposed to the use of such expertise in general, so long as private-sector participants would not be in a position to "benefit their interests." *See* Task Force Report at 18 (emphasizing the need to "prevent[] the 'tailoring' of contract specifications where a single vendor may gain an improper advantage"); State Ethics Comm'n Advisory Op. No. 94-09 (noting that the Task Force had addressed the "conflicts of interest that arise when nongovernment participants in the development of specifications and requests for proposals are not precluded from participating in the procurement and may thus be in a position to benefit their own interests"); State Ethics Comm'n Advisory Op. No. 95-13 (same).

In order to address its concerns, the Task Force recommended the addition of language that would make "individuals who assist in the preparation of procurement documents subject to the conflicts of interest provisions of the ethics law and prevent[] them from participating in any way in that procurement." Task Force Report at 31. This recommendation ultimately became what is now GP § 5-508, although it was amended—in part at the suggestion of Ethics Commission staff—to delete the broad requirement that anyone who assists in the preparation of procurement documents be "subject to the conflicts of interest provisions of the ethics law." *See* Advisory Op. No. 94-09 (describing the legislative history of the provision). The specific prohibition on self-dealing remained, however.

There is nothing in the legislative history of GP § 5-508 to indicate that the General Assembly intended the word "procurement" to mean only Division II procurement. Instead, it seems likely that the Legislature, having put in place new conflict of interest provisions to address the emergent use of private-sector expertise in the public procurement process, would have intended those provisions to apply broadly to *all* types of procurement. Although the Legislature, in 1994, may not specifically have had in mind P3s and other innovative project delivery methods, we

believe that the broad construction we give GP § 5-508 best effectuates legislative intent.

### b. Public-Private Partnership Legislation (SFP Title 10A)

Like the legislative history of the procurement ethics provisions, the legislative materials surrounding the enactment of the P3 statute do not expressly address whether the conflict of interest provisions of what is now GP § 5-508 apply to P3s and other innovative procurement methods. As discussed above, the legislative process that culminated in the enactment of Subtitle 10A of the State Finance and Procurement Article began in 2010, with legislation that established an initial regulatory framework for P3s and charged the Joint Legislative and Executive Commission on Oversight of Public-Private Partnerships ("P3 Commission") with evaluating how that framework should be revised to accommodate the growing interest in P3s. *See generally* 2010 Md. Laws, chs. 640, 641.

The legislative bill files surrounding the 2010 legislation do not mention the procurement ethics provisions and how they might apply to P3s. Although some of the materials reflect some nomenclatural uncertainty about whether P3s qualify as "procurement," none addresses the topic squarely.[14] Ultimately,

---

[14] For example, the Department of Budget and Management ("DBM") referred to P3s as procurement in its position statement on the proposed legislation. Hearing on H.B. 1370 Before the House Appropriations Committee, 2010 Leg., Reg. Sess. (March 10, 2010) (stating that DBM should not be the agency to provide staff for the P3 Commission because it "has no experience in developing these types of procurements or in the actual operation [of] private-public partnerships"). Senator Verna L. Jones, by contrast, testified that the bill's purpose was in part "to delete obsolete references to P3 as procurements." Hearing on S.B. 979 Before the Senate Budget and Taxation Committee, 2010 Leg., Reg. Sess. (March 24, 2010). The principal provision to which Senator Jones appears to have been referring appeared in § 4-205(c)(3) of the Transportation Article, which at the time required MdTA to provide a "public notice of procurement" whenever it intended to proceed with a "public-private partnership arrangement." TR § 4-205(c)(3)(ii) (2008 Repl. Vol.). That provision was amended to require MdTA to issue a "public notice of *solicitation* for a public-private partnership." *See id.* § 4-406(c) (2010 Supp.) (emphasis added)); *see also* SFP § 10A-202(a) (requiring the same for reporting agencies).

the 2010 legislation included the same definitional provision that we discussed above as one indication that the General Assembly did not intend to exempt P3s from the procurement provisions of the Ethics Law. It made clear that a "procurement governed by Division II" was not included within the definition of "public-private partnership" but did not exempt P3s from the generic definition of "procurement" or otherwise exempt them from the Ethics Law's conflict of interest provisions.

There is considerably more legislative history to consider for the P3 statute that was ultimately enacted in 2013. We have the P3 Commission's final report, the legislative materials relating to the failed 2012 bills, and the materials discussing the 2013 bills that eventually became law. These materials generally reflect the same nomenclatural uncertainty as to whether P3s constitute procurement. For example, many of those who testified before the General Assembly in 2012 described P3s as a specific type of procurement:

> We see P3's as just another "tool" for state and municipal agencies to utilize when considering the design and construction of capital asset[s]. By no means does this represent a wholesale change of traditional design and construction procurement process for state agencies.

Letter from Michael R. Crase, Vice President, Gilbane Bldg. Co., to Del. Maggie McIntosh (Feb. 24, 2012); *see also* Hearing on H.B. 576 Before the House Environmental Matters Committee, 2012 Leg., Reg. Sess. (Feb. 24, 2012) (testimony of Christopher D. Lloyd, McGuireWoods Consulting LLC) (describing P3s as the private and public sectors "collaborating in a procurement effort where risk and reward are shared"). We found nothing, however, that specifically addresses whether P3s constitute "procurement" for purposes of the procurement ethics provisions.

The Commission did, however, describe P3s in a way that suggests it saw them as a special *type* of procurement, as opposed to something other than procurement:

> The nature of P3 contracts can be quite different from routine procurements by the State. Procurement laws often focus on the purchase of goods and services and may not

always be robust enough to include revenue-generating contracts or long-term leases of facilities. Additionally, the review of P3 proposals may require alternative evaluation criteria and review processes not allowed by existing procurement laws, such as the use of best and final offers, negotiation with bidders, the shortlisting of bidders, or selection based on qualifications or best value. Most P3 enabling statutes specify the procurement or solicitation processes and evaluation criteria that may be used for P3s so that no legal questions arise about whether State procurement laws apply.

P3 Commission Report at 43. From this and other similar statements, it seems the Commission understood that P3s ordinarily would be governed by procurement laws but that those laws would frustrate many of the advantages of using P3s for complex projects. The solution, according to the Commission, was not to declare P3s to be something other than procurement, but to create an entirely new, unified set of P3 provisions that would be "similar to existing procurement law," but that would "clearly establish the authority for all agencies to enter into P3s and create a process for the solicitation of projects." *See* P3 Commission Report at 43. According to the Commission, that process should, among other things:

- Allow for the use of request [for] proposals, request for qualifications, and requests for information;

- Allow for the pre-qualification of bidders, short-listing of bidders, negotiation with bidders, and best and final offers;

- Permit the use of alternative evaluation criteria, such as selection based on best value or qualifications; [and]

- Allow unsuccessful bidders to be paid for the right to use work products from their proposals.

P3 Commission Report at 43-44. The Commission said nothing in its report that would suggest it thought that P3s would not be considered "procurement" for purposes of GP § 5-508.

Nor did the P3 Commission specifically address the extent to which the conflict of interest provisions of the Ethics Law apply to P3s. Although some who appeared before the Commission emphasized the need for "strict controls over accountability, transparency and conflicts of interest," *e.g.*, P3 Commission Report at 73 (comments of Mr. Lloyd), we found no evidence that the Commission took up this specific issue. The only indication we have been able to find that the General Assembly was aware of the interplay between the P3 legislation and what was then § 15-508 of the State Government Article ("SG") is the fact that House Bill 576 initially contained one provision that would have expressly exempted unsolicited P3 proposals from the Ethics Law:

> The provisions of § 15-508 of the State Government Article may not preclude an individual or firm that has submitted an unsolicited proposal under this title from submitting and participating in the competitive bidding process.

H.B. 576 (2012) (First Reader) (proposed to be codified at SFP § 10A-301(e)). That the bill's drafters felt the need to exempt unsolicited P3 proposals from SG § 15-508 indicates, of course, that they believed the provision would otherwise apply. Had the statute ultimately been enacted in this form, it would be strong evidence that the General Assembly understood that P3s ordinarily would be subject to the Ethics Law's procurement provisions.[15]

The 2012 legislation did not pass, however, and the bill was revised between sessions such that the version introduced in 2013 did not expressly provide for an exemption from SG § 15-508. Instead of exempting unsolicited P3 proposals from the Ethics Law, the 2013 bill affirmatively authorized the activity that the Ethics Law would have otherwise prohibited:

---

[15] The General Assembly had considered P3 legislation in previous sessions as well, some of which also would have expressly exempted P3s from the procurement ethics provisions of SG § 15-508. *See*, *e.g.*, S.B. 596 (2004) (proposing to amend § 15-508 to exempt the act of "[p]roviding specifications for a public-private partnership proposal procurement made in accordance with Title 17, Subtitle 5 of the State Finance and Procurement Article").

> An individual or firm that has submitted an
> unsolicited proposal under this title may
> participate in any subsequent competitive bid
> or competitive sealed proposal solicitation
> process.

H.B. 560 (2013) (First Reader).  After an amendment to delete the phrase "bid or competitive sealed proposal," this provision was enacted and signed into law as SFP § 10A-301(e).

The omission from the 2013 legislation of an express reference to what is now GP § 5-508 could mean that the Legislature, when it enacted the law, understood that the Ethics Law provision did *not* apply to P3s.  The bill files, however, provide no explanation for why the bill's drafter changed this provision between sessions.  Nor did the Department of Legislative Services ascribe any significance to the omission; its fiscal and policy note continued to describe the bill as "exempting [private entities that submit unsolicited proposals] from statutory ethics provisions that would otherwise prevent them from participating" in the resulting competitive procurement.  H.B. 560, 2013 Leg., Reg. Sess., Revised Fiscal and Policy Note at 5 (May 13, 2013).

In the end, what we draw from this is that the Legislature was likely aware of the potential applicability of the Ethics Law to P3s as "procurement" and yet chose not to exempt them from that Law's provisions.  Instead, the General Assembly elected to create an entirely *new* set of provisions that would "specify the procurement or solicitation processes and evaluation criteria that may be used for P3s."  P3 Commission Report at 43.  Those solicitation processes and evaluation criteria would be modeled after, but separate from, the Division II source selection provisions.  The Legislature appears to have chosen that path to avoid "legal questions . . . about whether State procurement laws apply," but not as a way of exempting P3s from the procurement ethics provisions of what is now GP § 5-508.

Having looked at the plain language of the operative statutory provisions, their place within the statutory scheme, and the history surrounding their enactment, we conclude that P3s involve procurement, at least in part.  Although the Legislature clearly intended to separate P3s from most aspects of the procurement law in Division II, we see little evidence that the General Assembly intended to exempt P3s from the conflict of interest provisions of the Ethics Law.  Given the importance of

the Ethics Law, we doubt very much that the General Assembly intended to exempt P3s from its ethical procurement provisions without expressly stating as much. Construing the Ethics Law liberally, we conclude that GP § 5-508 applies to public-private partnerships. *Cf. A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 32 (1983) (concluding that the Maryland Insurance Guaranty Association was subject to the Public Information Act because the Act "must be liberally construed in favor of inclusion in order to effectuate [its] broad remedial purpose").

### B. *How the Ethics Law's Conflict of Interest Provisions Apply to P3s*

Having concluded that the Ethics Law's procurement provisions apply to P3s, we turn next to *how* those provisions apply. At first blush, it might seem as if the conflict of interest provisions of GP § 5-508 are inconsistent with the P3 statute. Indeed, in certain respects, the statutes are squarely at odds. The Ethics Law, for example, would prohibit a proposer from competing on a contract when the proposer had "assist[ed]" in the drafting of specifications, whereas the P3 law specifically allows the proposer to discuss with the State "revisions to the solicitation documents." *Compare* GP § 5-508(a) *with* SFP § 10A-202(b).

When two statutes govern the same topic, we harmonize them through a series of canons of statutory construction. One such canon looks to which statute is the more specific: "Where provisions of one of the statutes deal with the common subject generally and those of the other do so more specifically, the statutes may be harmonized by viewing the more specific statute as an exception to the more general one." *Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 739 (2011) (quoting *Government Employees Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 132-33 (1993)). Another canon deems the more recent enactment to control in the event of a conflict. *Farmers & Merchants Nat. Bank of Hagerstown v. Schlossberg*, 306 Md. 48, 61 (1986).

The P3 statute is the more recently enacted of the two, and it is also the more specific. Whereas the Ethics Law broadly applies to all State agency procurement—whether governed by Division II or not—the P3 law applies only to the relatively few P3s that one of the "reporting agencies" or another State agency might enter into. Therefore, the P3 provisions of Title 10A that allow the government and qualified bidders to discuss project

specifications prevail over the provisions of GP § 5-508 prohibiting the same.

Our conclusion is consistent with the purposes of GP § 5-508. That provision aims to preserve the fairness and integrity of the competitive process. It is grounded in the Legislature's policy determination that an entity seeking to do business with the State should not be able to obtain a competitive advantage by unfairly influencing the terms of the solicitation that it might bid on, or by influencing the selection process to favor its bid. *See* Task Force Report at 31 (discussing the need for provision designed to ensure that a bidder would not be "in a position to suggest recommendations that may benefit their interests"); *see also id.* at 18 ("improper advantage"). Even though the P3 process allows some flexibility *after* the qualification stage, the qualification process itself unfolds just as a Division II procurement would. The restrictions of GP § 5-508 thus ensure that competition at the qualification stage unfolds without any party having the opportunity to gain an unfair advantage.

We believe that our conclusion is also consistent with the manner in which the State Ethics Commission has applied the restrictions of the procurement ethics provisions. In applying what is now GP § 5-508, the Commission has indicated that it must determine whether a private company's involvement in a procurement process constitutes "consultation with the agency," which is permissible, or instead amounted to "assist[ing] . . . in the drafting" of specifications, invitations for bids, or requests for proposals, as that phrase appears in GP § 5-508. Memorandum from State Ethics Commission to Agency Procurement Officers, Vendors at 4 (Oct. 1, 2014), *available at* http://ethics.gov.state.md.us/Procurement%20Summary.pdf (last visited Dec. 2, 2014). That determination, the Commission has observed, is a "factual determination to be judged by all of the surrounding circumstances." *Id.* In making that determination, the Commission considers, among other things, "the nature of the input, the frequency and timing of the input, and the nature of the process." *Id.*; *see* State Ethics Comm'n Advisory Op. No. 01-02 (same).

The Commission's is thus a functional approach, which ultimately focuses on whether, under the circumstances presented, the private individual or company would gain a competitive advantage if allowed to participate in the procurement process. For example, in Opinion 98-09, the Commission applied the provisions of SG § 15-508 to a procurement involving revisions

of the Department of Public Safety and Correctional Services' organizational structure. The first step in the procurement was the development of a "Blueprint" for the reorganization. The Blueprint would then serve as the "guide" for the second step in the procurement—the development of "a master plan for a correctional information system." The third and final step in the procurement involved the "actual implementation" of the master plan. The requestor was the successful bidder for the first phase of the procurement and asked whether § 15-508 operated to bar its participation in the second and third phases.

The Commission concluded that the vendor who designed the Blueprint was prohibited from bidding on the master plan, but not the final plan for implementation. Because the Blueprint "forms a part of the specifications" for the master plan procurement, allowing the vendor to participate in the master plan stage would place the vendor "in a position to benefit [its] own interests," which the Task Force had cautioned against. The same was not true at the implementation stage of the procurement. Whatever guidance the Blueprint might provide would be "largely superseded by the more detailed ongoing design activities" involved in developing the master plan. Under the circumstances, the Commission concluded that "the Requestor's involvement in the Blueprint development would be sufficiently remote that it would not be viewed as having assisted in the specifications for the implementation contract."

In Advisory Opinion 99-05, the Commission placed the same emphasis on whether the private company would obtain an unfair competitive advantage by participating in a procurement to provide certain energy services. At issue was whether a State employee who had been involved in preparing a request for qualifications would be able to leave State service and work for one of the companies that might seek to be qualified. The commission concluded that a vendor who employed the State employee would be barred from submitting a bid only if the employee had been employed by the vendor at the time the bid was submitted, *i.e.*, when the employee could have helped the vendor craft its bid. That same vendor, however, would not necessarily be barred from submitting a bid on the eventual implementation contract because that contract was too remote from the request for qualifications process. Again, the Commission's focus was on the timing of the employee's involvement and whether it gave the vendor an opportunity to influence the procurement process.

Finally, in Advisory Opinion 01-03, the Commission addressed whether a private engineering firm was barred from bidding on a State Highway Administration project by virtue of having reviewed, on behalf of the Maryland Department of the Environment ("MDE"), the stormwater management plan for the project. The Commission concluded that the firm was not barred:

> The purpose of the procurement ethics provision is to avoid situations where a vendor or private entity with an interest in a procurement is in a position to assist the agency in defining its needs and requirements and in essence drafting specifications, and then be a participant in what is to be a competitive process in selecting a contractor. The law was to prevent a contractor from assisting and then later competing for the contract which it assisted in defining. At the hearing SHA officials indicated their view that the requester under the circumstances described here did not receive a competitive advantage by its regulatory review work for the MDE.

We take from this that the restrictions of GP § 5-508 have been applied *functionally*, with the statute's purpose in mind. That purpose is effectuated by evaluating whether a particular vendor would obtain an unfair competitive advantage by being allowed to participate at a particular stage of the procurement process. Although the points of competition within the P3 process occur at slightly different times from those in a traditional procurement, those points of competition exist and allow for the application of the statute's conflict of interest provisions in much the same way that the Commission has applied them in more traditional contract settings.

The points of competition within the P3 process typically occur at the request for qualification stage and when the State ultimately evaluates the proposals. Accordingly, GP § 5-508 would prohibit a State unit from sitting down with a vendor prior to the qualification stage to hammer out the criteria by which qualifications will be judged. That would give the vendor an obvious and unfair advantage over its competitors. If a State unit wanted to discuss the project or the bidders' qualifications *prior* to the qualification stage, it would have to comply with one of the exemptions in GP § 5-508, such as having the potential bidders (if

there are two or more of them) submit written comments on the P3 qualification specifications and make those comments part of the pre-bid or pre-proposal process. *See* GP § 5-508(b)(2). Section 5-508 would similarly prohibit a private company from helping the agency to evaluate P3 proposals if that company had been involved in the preparation of one of the proposals under consideration.

By contrast, the P3 statute specifically authorizes a State agency to engage in discussions with a potential P3 vendor between qualification and award. Although those discussions might allow a vendor to convince the agency of the creative merit of the vendor's own proposal, the Legislature specifically determined that the additional value to the State from these discussions outweighed any perceived advantage that a firm might obtain. And any advantage a vendor may gain is gained through a process that is approved by the Board of Public Works and agreed to by the proposers themselves, and that ultimately results in a *competition* that will judge all proposers based on a single set of specifications.

We recognize that the application of GP § 5-508 to P3s will present challenges for the Commission. After all, P3 processes, by their very nature, are more fluid than other project delivery methods and contemplate much more input from potential bidders with expertise in a particular field. This distinguishes P3s from other project delivery methods that the Commission has already addressed. *See*, *e.g.*, State Ethics Comm'n Advisory Op. No. 98-01 (concluding, in the context of a design/build contract, that SG § 15-508 barred an architectural firm that prepared the request for proposals for the design and construction of workforce centers from participating as a consultant to a bidder on the project). But if GP § 5-508 did *not* apply to P3s, there would be no up-front statutory restraint on a potential proposer sitting with the State and influencing the competitive process in which it intends to participate.[16] Of course, State units can and often do include

---

[16] Statutory provisions and common law principles provide some means of *remedying* fraud and collusion in the awarding of public contracts *after* it has occurred. *See* SFP § 11-205 (providing for treble damages where "a person, for the purpose of defrauding the State, acts in collusion with another person in connection with the procurement process"); *Maryland Pavement Co. v. Mahool*, 110 Md. 397, 408 (1909) (providing for judicial review of contract award where there is evidence of "fraud or collusion"). These after-the-fact remedies were

conflict of interest provisions in the solicitations and contracts they enter into with qualified bidders, and those provisions might be sufficient to prevent improper influence at the bid selection stage. But we are construing *legislative* intent and we do not think that the General Assembly intended to leave the competitive integrity of the P3 process entirely up to the good intentions of executive branch agencies.

In sum, we conclude that a P3 under Title 10A has certain flexibility with regards to its solicitation process based on the plain language of that statute, but remains in other respects subject to GP § 5-508. In the event of a conflict between the P3 statute and § 5-508, the more specific provisions of the P3 statute will control.

### C. Whether the § 5-508 Restrictions on Participation in Procurement Apply to Design/Build Contracts and Other Project Delivery Methods.

We reach the same conclusion with respect to design/build, "construction management at risk," and the other construction project delivery methods about which you inquire. These delivery methods have been available to State agencies for many years before the advent of a comprehensive P3 statute in Title 10A. Design/build contracts, for example, are expressly provided for in the provisions of the State Finance and Procurement Article that govern the oversight and study of non-transportation, capital projects. *See* SFP § 3-602(g). Similar provisions have been included in the State Finance and Procurement Article since 1988—some 22 years before P3s received their first express legislative authorization. *See* 1988 Md. Laws, ch. 753 (adding provision that was subsequently codified as SFP § 5-309(g)); 1989 Md. Laws, ch. 540 (recodifying SFP § 5-309 as § 3-602).

We see no indication that the General Assembly ever intended design/build contracts to be treated as anything but procurement. They are not exempted from Division II, either in whole or, as is the case with P3s, in part. *See* SFP § 11-203(h). Rather, the only statutory provision that specifically addresses design/build contracts describes them in terms that are typical for

---

already in place in 1994, however, which suggests that, by enacting what is now GP § 5-508, the General Assembly did not consider them sufficient to address conflicts of interest in procurement.

procurement: "[D]esign/build . . . involves a single solicitation to design and build the facility." SFP § 3-602(g)(1).

The regulations that govern the use of design/build contracts also define them in familiar procurement terms. *See* COMAR 21.05.11.01B(1) ("'Design build' means a project delivery method in which a single entity is contractually responsible for both design and construction of a project."). Just as in procurement generally, the selection of the design/build contractor "shall be conducted using the multi-step sealed bid procurement method as provided in COMAR 21.05.02.17 or the competitive sealed proposals procurement method as provided in COMAR 21.05.03." COMAR 21.05.11.04A. And COMAR 21.05.11 cites as its enabling legislation SFP §§ 12-101, 13-103, and 13-104, which are the same sections that give the Maryland Board of Public Works discretionary authority over procurement, direct the promulgation of procurement regulations, and authorize the use of competitive sealed bids and competitive sealed proposals. We see no basis for concluding that design/build contracts are not procurement.

Because design/build contracts are procurement, the provisions of GP § 5-508 apply. Accordingly, an entity that assists the executive unit with drafting of specifications for the solicitation of a design/build contractor is prohibited from bidding on the solicitation, as the Commission has previously concluded. *See* Advisory Op. No. 98-01 (concluding that SG § 15-508 applied to design/build procurement). As with other project delivery methods, the State may conduct a multi-step invitation for sealed bids or a request for proposals under normal procurement procedures, select the design/build contractor under that process, and award the contract. *See* COMAR 21.05.11.04A, B. Only *after* award does the selected design/build contractor assist the State unit with refining the building's specifications, value-engineer a build price, and ultimately construct the project. The assistance with generating construction plans and specifications, then, is one of the primary objectives of the design/build contract. But at no point is a design/build bidder permitted to generate the specifications under which its *own* bid will be evaluated or selected—something that would give it the type of competitive advantage that GP § 5-508 was enacted to prohibit.

A construction management at risk contract is subject to GP § 5-508 by the same logic that applies to design/build contracts. Like design/build contracts, construction management at risk

contracts are procurement. They are defined in traditional procurement terms, *see* COMAR 21.05.10.01B(1), (4), are solicited using standard procedures for requests for proposals under COMAR 21.05.10.03, and are expressly authorized by regulations that are themselves authorized by the statutory provisions that govern Division II procurement. SFP §§ 12-101, 13-103, and 13-104. As is the case with the design/build contractor, the fact that the construction manager is involved with the design phase, but plays a role in the implementation of the construction phase, does not violate GP § 5-508. Again, the construction "specifications" with which a construction manager might assist an executive unit are not the same specifications that governed the selection of the construction manager. Consequently, the construction manager's assistance does not give it an unfair advantage over its competitors at the time of the solicitation. As with design/build contracts, a construction management at risk contract, if solicited appropriately by a request for proposals, fits comfortably within the ethical constraints of GP § 5-508.

Lastly, "fast track" is identified in SFP § 3-602(g) as another method where "design and construction are implemented concurrently." No further reference to fast track is made in statute, and the only similar definitions appear in the provisions of COMAR Title 23 relating to public school construction. *See* 23.03.01. Based on those definitions, fast track is not a unique procurement method or project delivery method, but rather authority for funding and implementing a procurement contract. A standard design contract is paired alongside a separately procured construction contract, and certain construction elements commence while other portions of the project are still in the design phase. *See* COMAR 23.03.01.01B(17).

As with the two other alternative construction methods discussed above, there is statutory and regulatory authority for the fast track construction approach. That authority is expressly provided by regulation in the public school construction context and is implied by statute more generally for other types of projects. SFP § 3-602(g). And here too we see no procurement statutes or regulations that expressly prohibit fast track for design and construction projects. As a result, we conclude that GP § 5-508 applies to fast track in the same manner that it would apply to any procured design or construction contract. We see no conflict here.

# III

## Conclusion

The procurement provisions of the Ethics Law apply to all "procurement" activity by an Executive Branch unit. Although public-private partnerships are exempt from most of the requirements of Division II of the State Finance and Procurement Article, P3s typically involve some activities that would otherwise qualify as "procurement." In the absence of legislative history indicating that the General Assembly intended to exempt P3s from the procurement conflict of interest provisions, and giving the Ethics Law the liberal construction it commands, we conclude that P3s are subject to the restrictions set forth in GP § 5-508. Where those restrictions conflict with the provisions of the P3 statute, however, the more specific P3 provisions control. Accordingly, agencies involved in P3 solicitations may conduct discussions with qualified bidders, to the extent provided for in the P3 statute, without violating GP § 5-508. We reach the same conclusion with respect to the applicability of the procurement ethics provisions to design/build contracts and the other project delivery methods you identify. Those methods constitute "procurement" within the meaning of GP § 5-508 but, if carried out appropriately, do not violate that provision's prohibition on self-dealing.

Douglas F. Gansler
Attorney General of Maryland

Scott Walchak
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice